Alvin C. COPELAND, et al., Plaintiffs,

Alvin C. Copeland, Plaintiff–Appellant,

v.

MERRILL LYNCH & CO., INC., et al., Defendants,

Merrill Lynch & Co., Inc., Defendant–Appellee.

Alvin C. COPELAND, Plaintiff,

v.

AMERICA'S FAVORITE CHICKEN COMPANY, et al., Defendants.

Alvin C. COPELAND, Plaintiff–Appellant,

v.

MERRILL LYNCH & CO., INC., et al., Defendants,

Merrill Lynch & Co., Inc., Defendant–Appellee.

No. 94–30179.

United States Court of Appeals, Fifth Circuit.

March 9, 1995.

---

Donald J. Miester, Jr., Benj. R. Slater, III, Mark E. Van Horn, Kevin M. Wheeler, New Orleans, LA, for appellant.

William R. Forrester, Jr., Lemle & Kelleher, New Orleans, LA, George J. Wade, Shearman & Sterling, New York, NY, N. Lee Cooper, James L. Goyer, III, Tony G. Miller, Maynard, Cooper, Frierson & Gale, P.C., Birmingham, AL, for appellee.

Before REYNALDO G. GARZA, DeMOSS and BENAVIDES, Circuit Judges.

DeMOSS, Circuit Judge:

In 1989, Alvin C. Copeland (Copeland), founder and franchisor of Popeye's Famous Fried Chicken decided to acquire competitor Church's Fried Chicken. After an acquisition and merger, the emerging company, Al Copeland Enterprises, Inc. (ACE), was the obligor on loans in the amount of $173 million from Merrill Lynch and $300 million from Canadian Imperial Bank of Commerce, Inc. (CIBC). Financial difficulties ensued, and ACE defaulted on the obligations. In April 1991, ACE entered Chapter 11 bankruptcy in the bankruptcy court for the Western Dis-

trict of Texas. Copeland, individually, brought the instant breach of contract action as an adversary proceeding in the ACE bankruptcy, claiming that Merrill Lynch and CIBC failed to perform under an agreement to submit a joint plan for ACE's reorganization to the bankruptcy court. After traveling through the tangled web of proceedings detailed below, the case landed in the Eastern District of Louisiana. That court granted summary judgment in favor of Merrill Lynch on Copeland's breach of contract claim, finding that no binding agreement had ever been reached by the parties, and Copeland appealed.[1] After a thorough review of the record, we conclude that there was no genuine fact issue and therefore affirm the district court's holding that no agreement was ever reached, 165 B.R. 417.

## I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### ACE's DIP Financing Motion

While the ACE bankruptcy was pending, Copeland, Merrill Lynch, ACE, CIBC and the creditors committee tried to obtain a consensus on a reorganization plan. As a condition to any agreement, CIBC demanded that ACE bring current pre- and post-petition interest on the defaulted debt. In July 1991, ACE moved for authority to arrange a debtor-in-possession financing facility (the DIP financing) to bring the interest arrears current. After objections to the DIP financing were raised by Merrill Lynch, the Church's Independent Franchises Association and the State of Texas, the parties feverishly negotiated amongst themselves to satisfy the various objectors and come up with a framework for a reorganization plan that would persuade the court to authorize the DIP financing.

On July 31, 1991, the bankruptcy court held a hearing on ACE's motion for DIP financing. Disagreement about what occurred in that hearing forms the basis of this lawsuit. Copeland claims that the parties entered into a binding agreement in this hearing to submit a joint plan of reorganization according to the terms announced in the hearing (the July 31 Agreement). Merrill Lynch claims that the only event of legal significance that occurred in the hearing was that the court approved the DIP financing. Under the plan discussed in the hearing, Copeland individually was to receive substantial cash and other assets (in excess of $30 million) for entering into four agreements with ACE: (1) a non-compete agreement; (2) a new supply agreement; (3) a settlement agreement; and (4) a formula and recipe agreement (the Copeland Agreements). Copeland sued for breach of the alleged July 31 agreement in general and for breach of the Copeland Agreements in particular.

At the conclusion of the hearing, the bankruptcy court granted the requested approval for DIP financing, stressing the importance of the fact that there was "the potential of seeing a consensual plan of reorganization." Needless to say, the plan alluded to in the July 31 hearing was never submitted to the court. After due diligence and further negotiation, the parties were unable to reach a final consensus concerning material terms of the reorganization plan, including the Copeland Agreements.

### Competing Plans for Reorganization and the Genesis of this Suit

In April 1992, CIBC submitted its own plan for reorganizing ACE. Copeland objected to the CIBC plan because it did not include certain favorable provisions of the Copeland Agreements. After submission of both the CIBC and Copeland plans to creditor vote the CIBC plan was adopted, over Copeland's objection. Copeland responded in May 1992 by filing this action against Merrill Lynch and CIBC, as an adversary proceeding in the bankruptcy court. Count I of Copeland's complaint requested specific performance by confirmation of the reorganization plan allegedly agreed to in the July 31 hearing. Count II sought money damages for breach of the July 31 agreement.

In October 1992, after a six-day hearing, the CIBC plan was confirmed by the bank-

---

1. CIBC was dismissed from the case by joint stipulation of Copeland and CIBC and entry of rule 54(b) judgment.

ruptcy court. One term of the CIBC plan compromised any claims ACE, the debtor, had against Merrill Lynch and CIBC, one of which was the potential claim for breach of the July 31 agreement.[2] To determine whether compromise was in the best interests of the estate, the bankruptcy court had to inquire whether ACE had a viable breach of contract claim and whether the potential recovery would return more to the estate than the plan being confirmed. The bankruptcy court decided that, although the debtor ACE and Copeland individually may have had a claim against Merrill Lynch for not proceeding with the alleged July 31 Agreement, the proposed CIBC plan was more beneficial for the estate and the creditors. Accordingly, the CIBC plan was confirmed.

*Bankruptcy Court's Continuing Jurisdiction over Copeland's Breach of Contract Claim Following Confirmation of CIBC Plan*

Following confirmation of the CIBC plan, the bankruptcy court raised *sua sponte* the issue of whether it had continuing jurisdiction over Copeland's individual claim for breach of the alleged July 31 Agreement. After argument of counsel, the bankruptcy court issued its Memorandum Opinion on Jurisdiction. The Memorandum Opinion concluded that the bankruptcy court either did not have or would decline to exercise continuing jurisdiction over Copeland's individual contract claim. In core proceedings under title 11 or arising in a case under title 11, the bankruptcy court can enter final orders and judgments. 28 U.S.C. § 157(b)(1). Bankruptcy judges may also hear non-core proceedings which are related to the bankruptcy proceeding. 28 U.S.C. § 157(c)(1). In those cases, the bankruptcy court can recommend findings of fact and conclusions of law to the district court, but cannot enter final orders or judgment. 28 U.S.C. § 157(c)(1). Copeland's request for specific performance, the bankruptcy court held, was

a core claim that was mooted by the court's confirmation of the CIBC reorganization plan. Copeland's damage claim, the court held, was a non-core claim which could no longer have any conceivable effect on the bankruptcy estate because many of the material issues, including the existence and breach of the alleged July 31 Agreement by Merrill Lynch, had already been litigated in the confirmation hearings. *See In re Wood,* 825 F.2d 90, 93 (5th Cir.1987) (adopting the "conceivable effect on the estate" test for non-core jurisdiction).

Despite the bankruptcy court's conclusion that it did not have jurisdiction, the Memorandum Opinion reiterated the confirmation hearing findings that Merrill Lynch, but not CIBC, had breached an obligation to submit the joint reorganization plan announced in the July 31 hearing. Relying on its asserted adjudication and release of Merrill Lynch's liability to ACE, the bankruptcy court concluded that Merrill Lynch would be precluded from litigating its liability to Copeland individually. Thus, the only remaining issue was the quantum of damages, regardless of where the matter was tried. Since the outcome of the damage determination could have no effect on the bankruptcy estate, the bankruptcy court decided that, even if its conclusion that it lacked jurisdiction was incorrect, it would decline to exercise jurisdiction over Copeland's non-core claim and would transfer the case instead. On appeal, Copeland claims that the bankruptcy court's findings, in the confirmation hearing and the Memorandum Opinion, prohibit Merrill Lynch from litigating either the existence or the breach of the July 31 Agreement.

*Proceedings in the Western District of Texas*

Merrill Lynch filed objections to the Memorandum Opinion pursuant to Bankruptcy Rule 9033, which the bankruptcy court denied.[3] Shortly thereafter the bankruptcy

---

**2.** Debtor ACE also had other substantial claims against Merrill Lynch based on Merrill Lynch's alleged failure to issue junk bonds and arrange for certain mortgage financing prior to the ACE bankruptcy.

**3.** Bankruptcy Rule 9033 provides for *de novo* review by the district court of written objections

to proposed findings of fact and conclusions of law entered by the bankruptcy court in a non-core proceeding. FED.R.BANKR.P. 9033. Denying Merrill Lynch's objections, the bankruptcy court stated that Rule 9033 was not applicable because the disputed findings were made as part of its core determination that it had no jurisdiction.

court issued an order transferring the case to the Eastern District of Louisiana, as requested by Copeland. Merrill Lynch moved for leave to appeal the order denying its objections and moved to stay transfer of the case pending appeal. On Merrill Lynch's appeal to the Western District of Texas, the district court found that the bankruptcy court had jurisdiction, not only over the specific performance request (core proceeding), but also over the damages claim (a non-core proceeding). The Western District therefore concluded that the case was properly transferred and declined to consider the substantive merits of Merrill Lynch's objections, stating that the arguments could be raised before the district court in Louisiana.

*Proceedings in the Eastern District of Louisiana*

Once in the Eastern District of Louisiana, Copeland moved for summary judgment, claiming that the doctrines of collateral estoppel and law of the case precluded Merrill Lynch from litigating its liability for breach of the July 31 Agreement. The district court denied this motion, based on its judgment that the bankruptcy court's compromise of Merrill Lynch's liability to ACE in the confirmation process did not include litigation of Merrill Lynch's liability to Copeland individually. The alleged July 31 Agreement, the court concluded, was merely an unenforceable "agreement to agree." For its conclusion that there was no binding agreement, the district court relied primarily on the uncertainty of material terms and indications in the DIP financing hearing transcript that everyone involved was aware that additional negotiation would be required to "complete the deal." As to the four Copeland Agreements, which were to be an integral part of the reorganization plan, the district court found that they changed substantially well

after the July 31 hearing and likewise never became final.

Based on the disposition of Copeland's motion, Merrill Lynch filed its own motion for summary judgment, which was granted by the district court. Despite a "voluminous record" and ample time for discovery, the district court found that Copeland failed to create a fact issue on elements essential to his case. We review the district court's entry of summary judgment in favor of Merrill Lynch *de novo*, applying the same standard as the district court. *Lemelle v. Universal Mfg. Corp.*, 18 F.3d 1268, 1272 (5th Cir.1994). Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Id.*

## II. DISCUSSION

Copeland argues that the district court put "the cart before the horse" by reaching the issue of whether there was an agreement, instead of merely enforcing the bankruptcy court's findings in the confirmation hearing (related to ACE's bankruptcy) and the Memorandum Opinion (entered in this adversary proceeding) that Merrill Lynch breached the July 31 Agreement. We conclude that the statements made by the bankruptcy court in the confirmation hearing, and reiterated in its Memorandum Opinion, did not bar Merrill Lynch from litigating its liability to Copeland individually.

*Collateral Estoppel—The Confirmation Hearing*

 Copeland maintains that the statements made by the bankruptcy court in ACE's confirmation hearing collaterally estop Merrill Lynch from litigating the existence and breach of the alleged July 31 Agreement in this proceeding.[4] Collateral

---

4. The bankruptcy court made findings that ACE had a potential claim against Merrill Lynch, but not CIBC, for breach of that portion of the July 31 Agreement calling for submission of a joint plan of reorganization. As to Copeland's individual claim, the court stated:

Mr. Copeland put on evidence through Mr. Jenkins and Mr. Talluto that the 7/31 agreement could have been consummated. Even if that were proven without a shadow of doubt, I do not find that that is a bar to considering the

confirmation of any other proposal put on the table in good faith by any other party in interest. All that means is that there are causes of action that may exist, clearly that may exist in favor of Mr. Copeland. And just as clearly, this plan does not affect that cause of action one iota.

So the real issue to try and analyze is whether or not the estate has a cause of action that should be pursued instead of confirming the plan, and that goes really to best interests, that

estoppel applies to bar litigation of an issue previously decided in another proceeding by a court of competent jurisdiction when four conditions are met: (1) the issue under consideration is identical to that litigated in the prior action; (2) the issue was fully and vigorously litigated in the prior action; (3) the issue was necessary to support the judgment in the prior case; and (4) there is no special circumstance that would make it unfair to apply the doctrine. *United States v. Shanbaum,* 10 F.3d 305, 311 (5th Cir.1994).

Merrill Lynch argues that it cannot be collaterally estopped by findings made in the bankruptcy confirmation hearing because the court had, at best, non-core jurisdiction over Copeland's individual claim, citing two cases decided by this Circuit which suggest that judgments rendered in core bankruptcy proceedings are not res judicata in non-core matters. *See Howell Hydrocarbons, Inc. v. Adams,* 897 F.2d 183, 189–90 (5th Cir.1990) (seller's RICO claims against officers and director's of bankrupt buyer's parent corporation not barred by bankruptcy proceedings of buyer and parent corporation); *Latham v. Wells Fargo Bank, N.A.,* 896 F.2d 979, 984 (5th Cir.1990) (borrower corporation's compromise of lender liability claims in bankruptcy confirmation did not bar litigation of co-borrower corporation owner's claims for lender liability in his individual capacity). Both *Howell* and *Latham* are distinguishable as involving res judicata (or claim preclusion) rather than collateral estoppel (or issue preclusion). *Howell* relied in large part on the fact that there was no identity of parties in the first and second proceeding, which is not a requirement for collateral estoppel. Additionally, we recently questioned whether *Latham* actually stands for the proposition that bankruptcy jurisdiction must always be core to be "competent" for res judicata purposes. *See In re Baudoin,* 981 F.2d 736, 741 n. 10 (5th Cir.1993). Because we find that the other requirements for application of collateral estoppel are not met in this case, we need not resolve that conflict.

■ Collateral estoppel does not preclude litigation of an issue unless both the facts and the legal standard used to assess them are the same in both proceedings. *Recoveredge L.P. v. Pentecost,* 44 F.3d 1284, 1291 (5th Cir.1995) (even when both suits arise out of the same factual setting, collateral estoppel does not apply unless both suits involve application of the same legal standard); *Brister v. A.W.I., Inc.,* 946 F.2d 350, 354 & n. 1 (5th Cir.1991) (even when issues are stated in "nearly identical language," collateral estoppel is unavailable when there are disparate policies underlying each inquiry which result in definite differences in application and result). Both the factual issue and the legal analysis required in the ACE bankruptcy confirmation hearing differ from the issue presented by Copeland's individual breach of contract claim.

The issue presently under consideration is whether there was a binding July 31 Agreement and whether Merrill Lynch breached any obligation to Copeland individually under that agreement. The objective of the confirmation hearing was to determine the confirmability of CIBC's proposed plan for reorganization. As part of that mandate, the bankruptcy court had to decide whether compromise of the numerous and varied claims held by ACE against Merrill Lynch and CIBC was in the best interest of the bankruptcy estate. Copeland's individual claim did not impact the bankruptcy court's consideration of the CIBC plan because, as explained by the bankruptcy court, the "real issue to try and analyze is whether the estate has any cause of action that should be pursued instead of confirming the plan." Determining whether to compromise the claim in the Chapter 11 proceeding required a balancing of the prospect and potential value of recovery from Merrill Lynch against the certain and ascertainable benefits assured under the CIBC reorganization plan. Copeland's individual claim, on the other hand, is governed by the ordinary principles of contract law. While acknowledging that causes of action "may exist" in favor of Copeland indi-

---

is ... going forward against Merrill Lynch, what would be the prospect for recovery?
 Is there anything in this record that shows that the prospect for recovery, under that sce-

nario, for this estate is any greater than what this estate is getting under this plan? And I would answer that question, "No."

vidually, the bankruptcy court stated that confirmation of the CIBC plan would not affect his claim in any way. Thus, the confirmation proceeding presented a different issue, analyzed using a different legal standard than that presented by Copeland's individual breach of contract claim.

■■ Nor was the issue of Merrill Lynch's liability to Copeland fully and vigorously litigated in the bankruptcy confirmation hearing. Collateral estoppel is unavailable when a "new determination of the issue is warranted by differences in the quality or extensiveness of the procedure followed in the two courts." RESTATEMENT (SECOND) OF JUDGMENTS § 28(3). Examining whether a particular settlement is fair or equitable and in the best interest of the estate and creditors is a different inquiry, driven by different policies, than litigation of the actual claim. *See, e.g., In re Jackson Brewing Co.,* 624 F.2d 599, 602 (5th Cir.1980) (bankruptcy court decides whether to release a claim by determining the probabilities of success, rather than the certainties). Such a determination is a far cry from the preponderance of the evidence standard Copeland would face in federal district court.

After reviewing the extensive record, it is apparent that whether there had been any breach of the alleged July 31 Agreement was in issue primarily as an aspect of whether CIBC, which both presented the July 31 plan and benefited from the DIP financing, acted in good faith. Copeland did present expert testimony that the alleged July 31 Agreement would have been a feasible way to reorganize ACE. The focus of the hearings, however, remained at all times on valuation and compromise of claims held by ACE, the debtor, against Merrill Lynch and CIBC. The material terms of the Copeland Agreements were not in issue and the essential elements of Copeland's claim for breach of those agreements, were not litigated.

■■ Finally, collateral estoppel does not apply unless the issue presented was a "critical and necessary part" of the prior judgment. *Society of Separationists, Inc. v. Herman,* 939 F.2d 1207, 1213 (5th Cir.1991), *cert. denied,* —— U.S. ——, 113 S.Ct. 191, 121 L.Ed.2d 135 (1992). Although valuing ACE's claim against Merrill Lynch was a critical part of confirming the CIBC plan, determination of Merrill Lynch's obligation, if any, to Copeland was not necessary to the bankruptcy court's conclusion that the estate would recover more by confirming the CIBC plan than by pursuing litigation against Merrill Lynch.

■■ Collateral estoppel (issue preclusion) differs from res judicata (claim preclusion) in that it is an equitable doctrine which should be "applied only when the alignment of the parties and the legal and factual issues raised warrant it." *Nations v. Sun Oil Co. (DELAWARE),* 705 F.2d 742, 744–45 (5th Cir.) (en banc), *cert. denied,* 464 U.S. 893, 104 S.Ct. 239, 78 L.Ed.2d 229 (1983). The district court has broad discretion to determine when collateral estoppel, particularly the type of offensive collateral estoppel at issue here, should be applied to preclude litigation of an issue. *Id.* Merrill Lynch's liability to Copeland for breach of contract was not at issue in the ACE bankruptcy confirmation hearing. Nor were the facts necessary to support Copeland's claim fully litigated as part of the bankruptcy court's decision to compromise ACE's claims against Merrill Lynch. We do not find that the district court abused its discretion by refusing to apply the doctrine of collateral estoppel. Therefore, Copeland cannot rely on the findings made in the ACE bankruptcy proceeding to preclude Merrill Lynch from litigating the existence and breach of the alleged July 31 Agreement.

*Law of the Case—The Memorandum Opinion on Jurisdiction*

■■ The law of the case doctrine provides that once a court of competent jurisdiction decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages of the same case. *Christianson v. Colt Indus. Operating Corp.,* 486 U.S. 800, 816, 108 S.Ct. 2166, 2177–78, 100 L.Ed.2d 811 (1988). Copeland argues that the rule 7052 findings made by the bankruptcy court in its Memorandum Opinion on Jurisdiction are the law of this case and preclude Merrill Lynch from litigating the existence

and breach of the alleged July 31 Agreement. We disagree for several reasons.

First, Merrill Lynch's liability to Copeland individually and the existence or scope of the alleged Copeland Agreements were not litigated in the instant proceeding. Instead, the bankruptcy court simply restated, without expressly adopting, the fact findings made in the ACE bankruptcy confirmation hearing and opined that those findings would preclude Merrill Lynch from litigating its liability to Copeland. Moreover, those remarks were offered merely for support of the actual "rule of law" being decided upon, which was that the court either did not have or should decline to exercise jurisdiction.

 Second, the preclusive effect of a bankruptcy court decree must reflect the reality of its limited jurisdiction. *Latham v. Wells Fargo Bank N.A.*, 896 F.2d 979 (5th Cir.1990). The bankruptcy court's jurisdiction over Copeland's individual damage claim for breach of contract was non-core at best. Thus, even assuming that the bankruptcy court's order transferring the case to the Eastern District of Louisiana is read to adopt a "rule of law" based on the bankruptcy court's earlier findings in the confirmation hearing, those findings would not be final until reviewed de novo by the district court. 28 U.S.C. § 157(c)(1) (bankruptcy judge may hear a non-core proceeding and make proposed findings of fact and conclusions of law but may not enter final order or judgment). Contrary to Copeland's assertions, the district court for the Western District of Texas did not address those findings. In fact, the court expressly declined to address the findings, holding only that the bankruptcy court had sufficient jurisdiction to transfer the case to the Eastern District of Louisiana where, the court stated, Merrill Lynch could submit its substantive objections to the bankruptcy court's findings.

 Third, the law of the case doctrine is a discretionary rule of practice which does not limit the *power* of the court to revisit a legal issue. *Arizona v. California*, 460 U.S. 605, 618, 103 S.Ct. 1382, 1391, 75 L.Ed.2d 318 (1983); *Tel–Phonic Services, Inc. v. TBS Int'l Inc.*, 975 F.2d 1134, 1138 (5th Cir.1992). Therefore, the Eastern District of Louisiana could properly decline to apply the doctrine to this case. The doctrine permits a change of position when it appears that the original ruling in the case was wrong. *Arizona v. California*, 460 U.S. at 619 n. 8, 103 S.Ct. at 1391 n. 8. This Court cannot be expected to reverse the correct ruling by the Eastern District of Louisiana simply because we find that it is contrary to a prior ruling by the bankruptcy court, particularly where the issue was not litigated. We hold that the district court did not err by refusing to apply "law of the case" to preclude Merrill Lynch from litigating its liability on Copeland's breach of contract claim.

Having removed the obstacle of earlier proceedings, the issue now becomes whether the district court correctly concluded that there were no genuine issues of fact concerning Merrill Lynch's liability to Copeland and that Merrill Lynch was entitled to judgment as a matter of law.

*The July 31 Agreement and the Copeland Agreements*

 No written document was prepared that purported to embody all of the material terms of the July 31 or Copeland Agreements. Copeland claims those terms were announced in the July 31 hearing on the DIP financing motion. However, even after the district court asked Copeland to submit the exact terms of the alleged agreements, with specific references to the record, Copeland was unable to identify any source for material terms in each of the agreements, either in the July 31 transcript or elsewhere in the record. We agree with the district court that the parties never reached an enforceable consensus either as to the July 31 Agreement to submit a joint plan of reorganization or the four Copeland Agreements which were to be part of that plan.

Concerning the July 31 Agreement to submit a joint reorganization plan, the hearing transcript together with other record evidence, clearly demonstrates that there was only a general commitment to move forward with negotiations. Neither Merrill Lynch nor CIBC would have agreed to the proposed $30 million post-petition DIP financing, which would significantly increase the

amount of debt that could be senior to their claims, unless there was hope that a reorganization plan could be developed. Nonetheless, many essential terms of the announced plan were conceded to be uncertain in the hearing itself, including the amount of additional funding, in excess of the DIP financing, that would be necessary to bring ACE out of Chapter 11, key aspects of debt restructuring and an overall business plan for management of the emerging entity.

In the hearing, Mr. Trost, counsel for CIBC, which was to be the obligee on the DIP financing, spoke first. Trost stated: "[t]he actual part that is before your honor is the DIP facility, but if you—but all the parties … I think have agreed in principle that the reorganization plan that was filed by the debtor will be amended and there will be facilitating agreements filed as exhibits which in a general way accomplish the following." After giving the "contours of an overall [reorganization] arrangement" for "information purposes," Trost concluded by stating: "[t]hat is the background of why we are asking the court to approve the DIP facility today." Next, Mr. Pitts, also counsel for CIBC, spoke as to the details of the DIP financing. Finally, the court "polled" the parties for their assent to what had been stated by Trost and Pitts. Subsequent comments by counsel indicate that, although all parties felt they had a duty to negotiate in good faith, no final agreement had been reached. Counsel for Church's Independent Franchises Association expressed strong reservations about whether the proposed plan could be confirmed, to which the court responded:

> "Well, I don't think they had represented that you had yet agreed to the plan but that you had agreed to the financing that was going to be requested to be authorized, and I think that's exactly what you did."

Counsel for the creditors committee also expressly limited his assent to the terms of DIP financing, stating that he had no authority to approve a plan process.

■ Thus, the record demonstrates that there was only an "agreement to agree" to a joint reorganization plan, contingent upon meeting the requirements of Chapter 11 and upon substantial additional negotiation. Such agreements to agree, particularly absent material terms such as the required amount of post-petition debt and the scope of the various Copeland agreements, are unenforceable under Texas law, the law of the state where the contract was allegedly formed. *T.O. Stanley Boot Co., Inc. v. Bank of El Paso,* 847 S.W.2d 218, 221–22 (Tex. 1992) (contract is not binding unless all material terms are specified and there are no essential terms left open for future negotiation); *Weitzman v. Steinberg,* 638 S.W.2d 171 (Tex.App.—Dallas 1982, no writ) (agreement to agree unenforceable). Further, even if all material terms had been provided, the agreement would not be enforceable. Chapter 11 requires that reorganization plans be subject to creditor vote and receive judicial scrutiny for compliance with statutory confirmation requirements, including the absolute priority rule and the feasibility standard. Counsel for Church's Independent Franchises Association expressed substantial reservation in the July 31 hearing about whether the terms under discussion would violate the absolute priority rule. In addition, it is apparent that the parties had not formulated any specific financial or business plan as required by Chapter 11's feasibility standard. We have in the past held that a transaction specifying the terms for adopting a reorganization plan cannot be enforced until the parties and the court "scale the hurdles erected in Chapter 11." *In re Braniff Airways, Inc.,* 700 F.2d 935, 940 (5th Cir.1983) (refusing to enforce transaction approved by the bankruptcy court because it dictated terms of a reorganization plan that had not yet been subjected to creditor vote or confirmation); *In re Continental Airlines,* 780 F.2d 1223, 1227 (5th Cir.1986) (debtor cannot sidestep protection extended to creditors under Chapter 11 by dictating plan of reorganization in a piecemeal fashion in collateral transactions before a plan is submitted for confirmation); *see also In re First South Savings Ass'n,* 820 F.2d 700, 714 & n. 15 (5th Cir.1987) (suggesting that bankruptcy court cannot rely on an overall plan for reorganization that has not been tested under Chapter 11 standards to approve post-petition financing when there is

no assurance that such a plan would be feasible or confirmable).

■ Concerning the Copeland agreements, both Copeland and Merrill Lynch were still negotiating the terms and scope of those agreements late in 1991. Copeland was to receive compensation from ACE once a plan incorporating the desired terms was reached and confirmed by the bankruptcy court. Merrill Lynch, as the potential majority owner of the emerging entity, was involved in drafting the Copeland Agreements, which were to be executed by ACE, the debtor, and Copeland individually. Much of the negotiation centered on exhibits and schedules which delineated the scope of the various agreements, such as what personnel would be subject to the non-compete agreement and what products subject to the supply agreement. Those schedules and exhibits were never completed or agreed upon by the parties and thus the Copeland Agreements never reached a final form.

■ Copeland maintains that he fulfilled his obligations under the agreements and that they became binding when he assented to Merrill Lynch's "final position" as expressed in a transmittal dated September 26, 1991. An examination of the record, however, reveals that even as of that late date material terms remained unsettled. On August 23rd Copeland wrote to Merrill Lynch Vice President Frank Duemmler: "[a]lthough we made tremendous progress on July 31st, it should have been obvious to everyone that a lot of work remained to finalize the four agreements. And it is equally obvious that the agreements will never be finalized unless the principals are directly involved." On September 20th, Merrill Lynch transmitted a proposed draft of the agreements that "represented Merrill Lynch's final position with respect to the matters to which they relate" and requested complete schedules from Copeland, as well as other information. On September 26th, Copeland answered that he concurred with the September 20th drafts. Under separate letter, Copeland also responded to questions posed by Merrill Lynch in the September 20th correspondence. Copeland's letter makes plain that the agreement was not fi-

nal. For example, Copeland proposed that he should retain certain insurance policies and benefits. Copeland also acknowledged that further negotiation was necessary on certain key schedules. Nonetheless, in a Wall Street Journal article published September 27th, Copeland claimed that he and Merrill Lynch had reached a "definitive agreement." Merrill Lynch immediately responded that no definitive agreement had been reached because due diligence was being held up, because management enhancements discussed had not been achieved, because Merrill Lynch had not received or reviewed any draft of exit financing documentation with the secured lenders and because any plan of reorganization would be subject to the final approval of Merrill Lynch's Executive Committee. Even as late as November 1991 there was correspondence indicating that there were remaining issues for negotiation.

■ Under Texas law, the state where the Copeland Agreements were allegedly formed, an agreement is not enforceable unless it resolves all essential terms and leaves no material matters open for future negotiation. *E.g., T.O. Stanley Boot Co., Inc. v. Bank of El Paso,* 847 S.W.2d 218, 221–22 (Tex.1992). The exhibits and schedules at issue were not incidental details but material provisions which delineated the scope and application of the Copeland Agreements and without which there could be no binding agreement. Because the parties never reached a binding consensus as to material terms, the Copeland Agreements at best amounted to unenforceable agreements to agree.

Merrill Lynch argues and the district court found below that Copeland admitted he was not a party to the alleged July 31 Agreement. We need not reach that issue. Even assuming Copeland was a party, the record is clear that the parties never reached a binding agreement, either in the July 31 hearing or at any later date. Copeland's claim that the record was factually insufficient to render summary judgment is likewise without merit. Ample time was allowed for discovery and Copeland was allowed an opportunity to identify the specific terms of the alleged agree-

ment by reference to the record, which he was unable to do. We affirm the district court's holding that there was no final July 31 Agreement as to either the joint reorganization plan or the Copeland Agreements.

## CONCLUSION

Neither collateral estoppel nor law of the case applied to preclude Merrill Lynch from litigating the existence and breach of the alleged July 31 Agreement. The bankruptcy court's confirmation findings did not reach the issue of Merrill Lynch's liability to Copeland individually and that issue was not fully litigated as part of confirming a reorganization plan in ACE's bankruptcy. While the bankruptcy court restated those findings in its Memorandum Opinion on Jurisdiction, those remarks were made in the context of the bankruptcy court's decision to decline jurisdiction and were further subject to *de novo* review by the Eastern District of Louisiana.

The record clearly supports the district court's analysis that as of July 31, the parties intended only to "agree in principle" to a basic framework for a joint reorganization plan in order to secure court approval for the post-petition DIP financing. Everyone involved recognized that further negotiations would be necessary to "complete the deal." Likewise the record supports the district court's conclusion that the parties never reached, on July 31 or thereafter, any consensus as to the material terms of the so-called Copeland Agreements. Copeland did not create any genuine fact issue to the contrary, and Merrill Lynch was entitled to judgment as a matter of law. Accordingly, the district court's order granting summary judgment in favor of Merrill Lynch is AFFIRMED.