United States Court of Appeals
Fifth Circuit

**F I L E D**

**February 9, 2005**

Charles R. Fulbruge III
Clerk

In the
# United States Court of Appeals
## for the Fifth Circuit

---

m 03–41646

---

CHARLES BAROS; ET AL.,

Plaintiffs,

CHARLES BAROS; LES FURMAN; AND ROGER MILLER,

Plaintiffs-Appellants,

VERSUS

TEXAS MEXICAN RAILWAY COMPANY,

Defendant-Appellee.

\* \* \* \* \* \* \* \* \* \* \* \* \* \*

ROBERT MARTIN; IRA SKLAR; DANIEL P. KUBECKA;
T.J. BABB HEIR'S PARTNERSHIP; AND RICHARD ANDERSON,

Plaintiffs-Appellants,

VERSUS

TEXAS MEXICAN RAILWAY COMPANY,

Defendant-Appellee.

Appeal from the United States District Court
for the Southern District of Texas

Before JONES, SMITH, and STEWART,
Circuit Judges.

JERRY E. SMITH, Circuit Judge:

In this property dispute, each of the plaintiffs (collectively, the "landowners") owns a parcel of land in Jackson or Victoria County, Texas, subject to a railroad right-of-way referred to as the "Victoria Segment" of the "Rosenberg Line."[1] The landowners sought a judgment declaring that the portion of the Victoria Segment's right-of-way that abuts their land reverted to them as a matter of law after Southern Pacific Transportation Company ("Southern Pacific"), the former owner of the line, allegedly abandoned it. The district court dismissed for want of subject matter jurisdiction. We affirm.

## I.
### A.

Southern Pacific sought permission to abandon the Victoria Segment in 1993 by filing a "Notice of Exemption" with the Interstate Commerce Commission ("ICC"),[2] asserting that no local traffic had moved over the line during the previous two years.[3] The

---

[1] The Rosenberg Line is approximately 85 miles long and runs between Rosenberg and Victoria, Texas. The Victoria Segment is approximately 62 miles long stretching from Wharton to Victoria, Texas. Texas Mexican Railway Company ("Texas Mexican") is the current owner of the line, having purchased it from Union Pacific Railroad Company ("Union Pacific") on March 12, 2001; Union Pacific acquired the line in 1996 after its merger with Southern Pacific.

[2] The ICC was abolished effective January 1, 1996, and the Surface Transportation Board ("STB"), in the Department of Transportation, was created and charged with performing the functions previously handled by the ICC. *See* ICC Termination Act of 1995, Pub. L. No. 104–88, 109 Stat. 804, 49 U.S.C. § 701 note.

[3] A rail carrier intending to abandon any part of its railroad lines must file an application with the STB. *See* 49 U.S.C. § 10903(a)(1)(A). The STB has the authority to exempt a rail carrier seeking to abandon a rail line from the ordinary procedures applicable to rail abandonments if the carrier certifies that no local traffic has moved over the line for at least two years; that any traffic on the line can be rerouted over other lines; and that no formal complaints regarding cessation of rail service on the line are pending or have been decided within the previous two years. *See* 49 C.F.R. § 1152.50(b). If the STB agrees that a proposed abandonment is exempt, it is required to consider whether the railway to be abandoned is appropriate for use for public purposes. *See* 49 U.S.C. § 10905; 49 C.F.R. § 1152.28(a)(1). If the agency determines that the property is appropriate for public use, it is authorized to impose conditions on the abandonment of the line by the rail carrier, including a prohibition on disposing of the property for 180 days unless the property is first offered for sale on reasonable terms for public purposes. *See*
(continued...)

Notice of Exemption became effective on December 1, 1993, subject to a "public use condition," imposed by the ICC, pursuant to 49 U.S.C. § 10906,[4] prohibiting Southern Pacific from disposing of the property for 180 days to permit interested parties to acquire it for public purposes.

In 1994, Southern Pacific entered into unsuccessful negotiations with another rail carrier regarding a possible sale of the entire Rosenberg Line. Later that year, the Gulf Coast Rural Rail Transportation District ("Gulf Coast"), a consortium of governmental entities and businesses, attempted to purchase or lease the Victoria Segment from Southern Pacific to preserve rail service, but the parties could not come to an agreement on price.

Having failed to reach an agreement, but determined to prevent Southern Pacific from removing the tracks, Gulf Coast filed a petition in state court seeking to condemn the Victoria Segment and requesting a temporary restraining order and temporary injunction. After the state court granted the temporary restraining order, Southern Pacific removed the matter to federal court and sought to quash the state court's temporary restraining order. Gulf Coast opposed the relief sought by Southern Pacific and requested the federal court to issue a temporary injunction.

On August 31, 1994, the district court granted a preliminary injunction in favor of Gulf Coast enjoining Southern Pacific from removing tracks along the Victoria Segment.

In granting the preliminary injunction, the district court found that Southern Pacific "clearly expressed its intent to permanently abandon the rail line from El Campo to Victoria" and that Southern Pacific "consummated its abandonment of the rail line." As a result, the district court concluded that the "ICC no longer exercises jurisdiction over the rail line."[5]

In April 1995, while the Gulf Coast suit was pending, Southern Pacific filed a letter with the ICC reporting that the Texas Parks and Wildlife Department had expressed an interest in acquiring the Victoria Segment for rail-banking and interim trail use purposes, pursuant to the National Trails Act, 16 U.S.C. § 1247(d).[6] In a decision and order issued on May 4, 1995, the ICC reopened the abandonment proceeding and issued a Notice of Interim Trail Use ("NITU").[7] The NITU ex

---

[3](...continued)
49 U.S.C. § 10905.

[4] This provision is now codified at 49 U.S.C. § 10905.

[5] The Gulf Coast suit was remanded to state court in July 1995 when the district court decided to abstain from exercising jurisdiction in light of its conclusion that the ICC no longer had jurisdiction over the rail line. After the case remained inactive for several years, Gulf Coast eventually opted to nonsuit in October 2000.

[6] The National Trails Act authorizes the ICC/STB "to preserve for possible future railroad use rights-of-way not currently in service and to allow interim use of the land as recreational trails." *Preseault v. ICC*, 494 U.S. 1, 6 (1990). Under the Act, a state, political subdivision, or private entity may, in certain circumstances, acquire a rail right-of-way, on terms established by the ICC/STB, for interim trail use, subject to future reactivation of rail service over the line. *See* 16 U.S.C. § 1247(d); 49 C.F.R. § 1152.29.

[7] The term "NITU" is used in exempt abandonment proceedings, but in regulated abandonment proceedings the STB issues a "Certificate of
(continued...)

tended the effective date of the notice of exemption for 180 days, to November 8, 1995, thereby deferring Southern Pacific's authority to abandon the line and permitting negotiations for possible rail-banking and interim trail use to continue through that date.

In an effort to permit continued negotiations between the Texas Parks and Wildlife Department and Southern Pacific, the negotiation period was extended on two more occasions, first on November 17, 1995, by a decision of the ICC, and second on May 21, 1996, by a decision of the STB. The final negotiation period expired on November 30, 1996, without an agreement.

Between 1995 and 1996, Southern Pacific and Union Pacific had been engaged in negotiations to merge. The STB approved the merger on August 12, 1996, and Union Pacific succeeded to Southern Pacific's ownership interest in the Rosenberg Line.

In 1998, Texas Mexican and Union Pacific entered into negotiations regarding the sale of the Rosenberg Line. In November 1999, Union Pacific and Texas Mexican executed a contract whereby Texas Mexican agreed to purchase the line from Union Pacific on the express condition that the STB issue a decision determining that the Victoria Segment remained subject to the STB's jurisdiction and authorizing the sale.

Texas Mexican thus petitioned the STB in August 2000 to determine whether the Victoria Segment was subject to the STB's jurisdiction and to authorize the sale. On December

8, 2000, the STB issued a decision granting Texas Mexican's petition, stating its conclusion that it still retained jurisdiction over the line, and approving the sale. In March 2001, Texas Mexican purchased the line from Union Pacific for $9,200,000.

B.

In May 2002, the landowners filed separate declaratory judgment actions against Texas Mexican in state court in Jackson County and Victoria County. The landowners sought judgments declaring that the railroad right-of-way at issue (the Victoria Segment) was abandoned as a matter of law by Southern Pacific and that the STB no longer exercises jurisdiction over the line. Texas Mexican removed the actions to federal court on the basis of a federal question, *i.e.*, whether there had been an abandonment and a resulting termination of federal agency jurisdiction; the actions were consolidated.

Both sides moved for summary judgment. The landowners moved for partial summary judgment, contending that Southern Pacific had abandoned the Victoria Segment as a matter of law as early as 1994, and, consequently, the STB had been improperly exercising jurisdiction over the Victoria Segment. To that end, the landowners maintained that the district court's findings of fact and conclusions of law in the Gulf Coast suitSSnamely, its finding that Southern Pacific had consummated the abandonment of the Victoria Segment, and its conclusion that the ICC no longer had jurisdiction over the lineSSwere entitled to preclusive effect in their declaratory judgment action.

Texas Mexican moved for summary judgment, claiming that the district court lacked subject matter jurisdiction because (1) the STB

[7](...continued)
Interim Trail Use" ("CITU"). *See* 49 C.F.R. § 1152.29 (c)-(d).

4

retained exclusive and plenary jurisdiction to determine whether the Victoria Segment had been abandoned; and (2) the landowners' declaratory judgment action was an improper collateral attack on the STB's December 15, 2000, decision approving the sale of the Rosenberg Line from Union Pacific to Texas Mexican.

In October 2003, the district court denied the landowners' partial summary judgment motion and granted Texas Mexican's summary judgment motion, thereby dismissing the landowners' suit for want of subject matter jurisdiction. In so doing, the court refused to give preclusive effect to its prior decision in the Gulf Coast suit, finding that it "was limited to the issues surrounding the application for a temporary injunction" and was thus not reached after "a final hearing on the merits."

In a thorough opinion, the court determined that the conditional nature of the abandonment exemption granted Southern Pacific by the ICC was dispositive: It held that when an abandonment exemption is conditional, the STB retains jurisdiction over a railroad right-of-way until it has been abandoned pursuant to the conditions established by the agency; and, in such cases, the agency retains exclusive and plenary jurisdiction to determine whether there has been an abandonment sufficient to terminate its jurisdiction.

Because the original exemption granted to Southern Pacific was conditional, the district concluded that the STB retained exclusive jurisdiction to determine whether Southern Pacific or its successors in interest ever consummated the abandonment of the Victoria Segment. Moreover, the court characterized the landowners' suit as an improper collateral attack on ICC and STB decisions precluded by the Hobbs Act, 28 U.S.C. § 2342(5), which vests federal courts of appeals with exclusive jurisdiction to review all final STB orders.

## II.

The landowners contend that because the "precise issue"SSwhether Southern Pacific consummated the abandonment of the railway, thereby terminating STB jurisdiction over the lineSSwas decided in the Gulf Coast temporary injunction proceeding, that finding is entitled to preclusive effect. This plea for collateral estoppel is unavailing.

## A.

"Collateral estoppel *vel non* is a question of law reviewed *de novo*." *Baby Dolls Topless Saloons, Inc. v. City of Dallas*, 295 F.3d 471, 478 (5th Cir. 2002). Where a party seeks to employ collateral estoppel offensively, however, a court has broad discretion to determine whether relitigation of an issue should be precluded. *See, e.g.*, *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 331 (1979). "We thus review the district court's refusal to offensively apply collateral estoppel only for abuse of the broad discretion afforded it." *Winters v. Diamond Shamrock Chem. Co.*, 149 F.3d 387, 392 (5th Cir. 1998) (citing *Copeland v. Merrill Lynch & Co.*, 47 F.3d 1415, 1423 (5th Cir. 1995)).

## B.

To determine whether collateral estoppel applies, we consider whether

(1) the issue under consideration is identical to that litigated in the prior action; (2) the issue was fully and vigorously litigated in the prior action; (3) the issue was necessary to support the judgment in the prior case; and (4) there is [any] special circumstance that would make it unfair to apply the

doctrine.

*Winters*, 149 F.3d at 391 (quoting *Copeland*, 47 F.3d at 1422). We have set out several other "safeguards that must be present before estoppel may be employed." *Id.* As relevant here, first among these additional safeguards is a "requirement that the 'facts and the legal standard used to assess them are the same in both proceedings.'" *Id.* (quoting *Copeland*, 47 F.3d at 1422). Second, we inquire whether "a 'new determination of the issue is warranted by differences in the quality of extensiveness of the procedures followed in the two courts.'" *Id.* (quoting *Copeland*, 47 F.3d at 1423) (quoting RESTATEMENT (SECOND) OF JUDGMENTS § 28(3))). Third, we regard the availability of judicial review of the first proceeding as being "of paramount importance to the issue of preclusion." *Id.* at 395.[8]

## C.

The district court can hardly be said to have abused its discretion by deciding that its finding in the Gulf Coast suit was not entitled to preclusive effect. Not only was the abandonment finding entered only ten days after Gulf Coast sued Southern Pacific, but it was made under the legal standard applicable to issuance of a temporary injunctionSS*i.e.*, a substantial likelihood of success on the merits in light of a substantial threat of irreparable injury. Thus, the abandonment finding cannot be said to have been "fully and vigorously litigated in the prior action,"[9] nor was the question of abandonment assessed under the same legal standard as would be applicable on a direct petition for review of an order of the STB.[10]

Moreover, the prior abandonment finding was not subject to judicial review. The district court's August 31, 1994, order granting the temporary injunction, which incorporated the court's findings of fact and conclusions of law, never went into effect because Gulf Coast failed to post the bond required as a prerequisite.[11] Southern Pacific thus had neither the incentive to appeal (because the judgment never went into effect) nor the ability to appeal (because the order was not final). Because we have treated finality and the concomitant availability of judicial review as an essential

---

[8] Indeed, as noted in *Winters*, the Restatement "specifically provides for an exception to preclusion when '[t]he party against whom preclusion is sought could not, as a matter of law, have obtained review of the judgment in the initial action.'" *Winters*, 149 F.3d at 395 & n.9 (quoting RESTATEMENT (SECOND) OF JUDGMENTS § 28(1)); *see also* 18 WRIGHT, MILLER & COOPER, FEDERAL PRACTICE AND PROCEDURE § 4421, at 203 (1981) ("Since appellate review is an integral part of the system, there is strong reason to insist that preclusion should be denied to findings that could not be tested by the appellate procedure ordinarily available, either by appeal or cross appeal.") (footnotes omitted).

[9] *Winters*, 149 F.3d at 391 (quoting *Copeland*, 47 F.3d at 1422).

[10] *See, e.g.*, *Copeland*, 47 F.3d at 1422 ("Collateral estoppel does not preclude litigation of an issue unless both the facts and the legal standard used to assess them are the same in both proceedings.").

[11] *Accord United States v. Assoc. Air. Transp., Inc.*, 256 F.2d 857, 861 (5th Cir. 1956) (noting that until posting of the required bond the order granting an injunction "was conditional and without operative effect, and . . . there was, in short, no order to appeal from").

6

predicate to issue preclusion,[12] this fact alone is sufficient to reject the landowners' preclusion argument.

Accordingly, given, *inter alia*, the temporary and limited treatment the issue of abandonment received in the Gulf Coast suit's preliminary injunction proceeding, the legal standard applied in that proceeding, and the unavailability of judicial review, the district court did not abuse its discretion in refusing to give preclusive effect to its abandonment finding.

### III.

Putting aside the question of estoppel, we now consider anew the district court's conclusion that it lacked subject matter jurisdiction "to determine whether Southern Pacific or its successors in interest ever consummated the abandonment of the Line." We conclude that because the abandonment authorization initially granted by the ICC was conditional, the STB retained exclusive and plenary jurisdiction to determine whether there has been an abandonment sufficient to terminate its jurisdiction. Accordingly, the district court properly concluded that it lacked subject matter jurisdiction to hear the landowners' suit alleging that, as a matter of law, Southern Pacific consummated the abandonment of the Victoria Segment.

### A.

Although the district court concluded that it lacked subject matter jurisdiction over the landowners's suit, it did not dismiss the suit under FED. R. CIV. P. 12(b)(1); rather, it dismissed for want of jurisdiction by granting Texas Mexican's summary judgment motion. In any event, the distinction is ultimately of little consequence for purposes of this appeal, because "[w]e review dismissals for lack of subject matter jurisdiction and grants of summary judgment *de novo*." *Hager v. NationsBank, N.A.*, 167 F.3d 245, 247 (5th Cir. 1999) (per curiam).[13]

### B.

Once a rail carrier abandons a line, the line is no longer part of the national transportation system, and the STB's jurisdiction terminates. *See Preseault*, 494 U.S., at 5 n.3. Thus, in proceedings in which the STB imposes no conditions on an abandonment, the STB's decision to authorize the abandonment will end its jurisdiction over the line.[14]

---

[12] *See, e.g.*, *J.R. Clearwater, Inc. v. Ashland Chem. Co.*, 93 F.3d 176, 179 & n.2 (5th Cir. 1996) ("Finality is an essential component of the concepts of both *res judicata* and collateral estoppel."); *Avondale Shipyards, Inc. v. Insured Lloyd's*, 786 F.2d 1265, 1269-73 (5th Cir. 1986) (refusing to grant preclusive effect to partial summary judgment order on the basis that it was not appealable); *id.* at 1270 ("We are not aware of any federal appellate decision which has applied preclusion to a prior nonfinal ruling as to which appellate review was unavailable . . . .").

[13] *See also Martinez v. Dep't of U.S. Army*, 317 F.3d 511, 512 (5th Cir. 2003) ("This Court reviews dismissals for lack of subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1) based on questions of law *de novo*."); *Pluet v. Frasier*, 355 F.3d 381, 383 (5th Cir. 2004) ("We review the grant of a motion for summary judgment *de novo*.").

[14] *See, e.g.*, *Hayfield N.R.R. v. Chicago & N.W. Transp. Co.*, 467 U.S. 622, 633 (1984) ("[U]nless the Commission attaches postabandonment conditions to a certificate of abandonment, the Commission's authorization of an abandonment brings it regulatory mission to an end."); *see also Lucas v. Township of Bethel*, 319 F.3d 595, 602 (3d Cir. 2003) ("In cases where the ICC has placed no conditions on a railroad abandonment . . . the (continued...)

In contrast, where an abandonment is conditional, the STB retains jurisdiction over a railroad right-of-way until it has been abandoned pursuant to the conditions imposed by the agency. *See id.*; *Lucas*, 319 F.3d at 603. "In such cases, the agency also retains exclusive, plenary jurisdiction to determine *whether there has been an abandonment* sufficient to terminate its jurisdiction." *Lucas*, 319 F.3d at 603 (citing *Friends of the Atglen-Susquehanna Trail*, 252 F.3d at 262).

There is no dispute that Southern Pacific's authority to abandon the Victoria Segment was expressly conditioned in several respects by the ICC's decision granting its Notice of Exemption.[15] First, the ICC imposed a 180-day public use condition "to enable any State or local government agency or other interested person to negotiate the acquisition of the line for public use." Second, the ICC required Southern Pacific to "consult with [the Texas Natural Heritage Program] prior to initiating any salvage activities on this line." Third, the ICC required that Southern Pacific "consult with the [U.S. Army Corps of Engineering] concerning future flood prevention measures prior to initiating any salvage activities on the line." And fourth, the ICC prohibited South-

___

[14](...continued)
ICC's decision to authorize an abandonment will bring its jurisdiction to an end."); *Friends of the Atglen-Susquehanna Trail, Inc. v. STB*, 252 F.3d 246, 262 (3d Cir. 2001) ("Unless the STB attaches post-abandonment conditions to a certificate of abandonment or exemption . . . the authorization of abandonment ends the Board's regulatory mission and its jurisdiction.").

[15] *See S. Pac. Transp. Co.*SS*Abandonment Exemption*SS*In Jackson, Victoria, and Wharton Counties, TX*, Docket No. AB-12 (Sub. No. 162X) (Dec. 23, 1993).

ern Pacific from "altering the historic integrity" of a portion of the line until completion of the National Historic Preservation Act review process.

Because Southern Pacific's abandonment authorization was conditional, the district court correctly determined that the STB retained exclusive and plenary jurisdiction over the line to determine whether there has been an abandonment sufficient to terminate its jurisdiction. *See id.* Consequently, the court correctly concluded that it did not have jurisdiction to decide whether Southern Pacific or its successors in interest abandoned the line.

C.

The landowners do not directly dispute any of the foregoing. Instead, they contend that Southern Pacific's abandonment was automatically consummated, as a matter of law, when no agreement was reached on interim trail use within the initial 180-day period imposed by the ICC, thus depriving the agency of further jurisdiction over the right-of-way and allowing the landowners' reversionary interests to vest. According to this theory, the agency's order of May 4, 1995, reopening the Victoria Segment's abandonment proceeding and postponing the abandonment exemption's effective date for 180 days to allow for further interim trail use negotiations, was for naught, because the agency no longer had jurisdiction over the line; the same was true for its November 17, 1995, and May 21, 1996, decisions further postponing the effective date, and the STB's December 8, 2000, decision approving the sale of the line to Texas Mexican.

It is not disputed that under STB regulations a NITU, such as the one issued here (or a CITU in nonexempt abandonment proceed-

ings), converts into an effective certificate of abandonment if no trail use agreement is reached during the period allotted for negotiation.[16] But from this proposition the landowners infer that abandonment is consummated as a matter of lawSSand thus agency jurisdiction terminatesSSif no interim trail use agreement is reached upon expiration of a NITU. This, however, is incorrect.

The relevant STB regulation states that expiration of a NITU will "permit" a railroad fully to abandon the line, therefore indicating that an effective certificate of abandonment authorizes, but does not itself establish, complete consummation of the abandonment.[17] Thus, "an effective certificate of abandonment confers *permissive* authority on the railroad; until the railroad actually consummates an abandonment, none occurs, and the Commission retains jurisdiction over the railroad's right-of-way." *Birt*, 90 F.3d at 589 (emphasis added). The landowners' claim that agency jurisdiction was automatically terminated upon expiration of the initial 180-day public use negotiation period is, therefore, contrary to the plain text of the governing regulations and is based on an incorrect view of the abandon-

ment regime.[18]

Indeed, the problem with the landowners' argument is more acutely perceived in light of recent changes in the railway abandonment regime. "Historically, the STB determined whether an abandonment was consummated by evaluating the rail carrier's objective intent to cease permanently or indefinitely all transportation service on the line." *Lucas*, 319 F.3d at 603 n.11. Because of the uncertainty such an approach fostered as to a particular line's status, however, the STB, since 1997, has required rail carriers to file with the agency a letter confirming consummation of abandonment.[19] Although a similar filing requirement was in effect before the Victoria Segment's abandonment was authorized in December 1993,[20] no such requirement was in effect when the Victoria Segment's authoriza-

---

[16] *See, e.g.*, *Birt v. STB*, 90 F.3d 580, 583 (D.C. Cir. 1996) ("If the parties do not reach agreement, the certificate of abandonment becomes effective upon expiration of the CITU."); *id.* n.11.

[17] *See* 49 C.F.R. § 1152.29(d)(1) ("The NITU will . . . *permit* the railroad to fully abandon the line if no agreement is reached 180 days after it is issued, subject to appropriate conditions, including labor protection, and environmental matters." (emphasis added); *see also* 49 C.F.R. § 1152.29(c)(1) ("The CITU will . . . *permit* the railroad to fully abandon the line if no agreement is reached 180 days after it is issued . . . .") (emphasis added).

[18] Moreover, the fact that an abandonment proceeding can be reopened to grant a NITU or CITU more than 180 days after the abandonment exemption's issuance, or that a NITU can be extended beyond the 180-day statutory period, provides further support for this conclusion. *See, e.g.*, *Birt*, 90 F.3d at 589 (upholding the STB's authority both to extend an NITU for more than 180 days and retroactively to extend an NITU after its expiration). That is, if, as the landowners contend, an abandonment were automatically consummated as a matter of law absent agreement 180 days after issuance of a NITU, the agency would be without jurisdiction to reopen or extend the period for negotiations.

[19] *See Lucas*, 319 F.3d at 603 n.11 (citing *Becker v. STB*, 132 F.3d 60, 61 n.2 (D.C. Cir. 1997)).

[20] *See, e.g.*, *Consol. Rail Corp. v. STB.*, 93 F.3d 793, 798 (D.C. Cir. 1996) (noting pre-1984 requirement that rail carriers file with the ICC a letter confirming consummation of abandonment).

tion occurred.

Critically, no such public filing requirement would be necessary if the STB's jurisdiction over a rail line ceased automatically as a matter of law on the expiration of the 180-day period imposed by a NITU. To the contrary, this filing requirement implicitly recognizes that the decision actually to abandon a line rests with the carrier; it is only upon actual consummation of the abandonment that the STB's jurisdiction ceases.

### D.

As we have indicated, because the original abandonment authorization was conditional, the determination of whether there has actually been an abandonment is within the primary and exclusive jurisdiction of the STB. Despite the STB's exclusive jurisdiction to determine whether the abandonment has been consummated, however, the landowners' suit sought a declaration from the district court that Southern Pacific had consummated the abandonment of the Victoria Segment as early as 1994 as a result of various acts and omissions on the line.[21] Whatever the merits of these contentions, it is evident that the practical effect of the landowners' suit is improperly to challenge various ICC and STB decisions that necessarily (albeit implicitly) decided that Southern Pacific did not consummate the

abandonment of the Victoria Segment.

In at least four decisions and orders issued after the conditional abandonment was authorized in 1993, the ICC and STB exercised jurisdiction over the Victoria Segment.[22] The landowners stress that none of these decisions ever directly held that Southern Pacific had not consummated the abandonment of the Victoria Segment. But what the landowners fail to grasp is that each decision and order issued by the ICC and STB after the initial abandonment authorization in 1993 required continued agency jurisdiction over the Victoria SegmentSSand therefore no consummated abandonmentSSto be valid agency action.

In other words, if, as the landowners maintain, Southern Pacific had in fact consummated the abandonment of the Victoria Segment as early as 1994, it follows that the agency was *ultra vires* in each of its decisions between the initial abandonment authorization and the ultimate sale of the line, because once an abandonment is consummated, the agency's jurisdiction terminates. *See Preseault*, 494 U.S. at 5-6 n.3; *Birt*, 90 F.3d at 585. Consequently, each of the decisions and orders issued by the ICC and STB between the initial abandonment authorization and the ultimate sale of the line necessarily (again, albeit implicitly) determined that Southern Pacific had

---

[21] The landowners point to the following alleged acts and omissions on the part of Southern Pacific to support their contention Southern Pacific consummated the abandonment of the line: (1) its removal of rails and ties; (2) its failure to repair flood-damaged portions of the line; (3) its failure to maintain mowing and spraying operations; and (4) its failure to object to certain landowners' fencing in portions of the right-of-way for grazing purposes.

[22] As we have indicated, these include the ICC's May 4, 1995, decision reopening the Victoria Segment's abandonment proceeding and postponing the exemption's effective date for 180 days to allow for interim trail use negotiations; the ICC's November 17, 1995, decision and the STB's May 21, 1996, decision further postponing the exemption's effective date to allow for continued trail use negotiations; and the STB's May 8, 2000, decision approving the sale of the Rosenberg Line to Texas Mexican.

not consummated the abandonment of the Victoria Segment.[23]

Therefore, "[a]lthough not in form a request for review of an ICC order, the practical effect is to seek such a review." *Dave v. Rails-to-Trails Conservancy*, 79 F.3d 940, 942 (9th Cir. 1996). Pursuant to the Hobbs Act, however, the courts of appeals have exclusive jurisdiction over any action to enjoin, suspend, or determine the validity of an STB order. *See* 28 U.S.C. § 2342(5). The proper means, therefore, by which the landowners could have challenged the STB's continued jurisdiction over the line, and the implicit decision that Southern Pacific had not consummated the abandonment, would have been to seek direct judicial review (within sixty days) of any of the ICC's or STB's orders. *See* 28 U.S.C. § 2344.

Of course, it is true generally that under 28 U.S.C. § 2344 only a "party aggrieved" by a final agency order may seek direct judicial review, and the term "party aggrieved" is "used in a definitive sense in the statute, and limits the right of appeal to those who actually participated in the agency proceeding." *Am. Trucking Ass'ns, Inc. v. ICC*, 673 F.2d 82, 84 (5th Cir. 1982) (per curiam).[24] But the fact

that only parties to the agency proceedings can seek direct review under the Hobbs Act does not excuse the Landowners from following this exclusive procedure, thereby allowing them collaterally to attack various agency orders by maintaining a declaratory judgment action in district court. Rather, this statutory limit on the availability of direct review indicates that the landowners had an affirmative duty to intervene[25] before the agency in any of the proceedings involving the Victoria Segment beginning in 1994, when they claim Southern Pacific consummated the abandonment, until the STB's approval of the sale of the Rosenberg Line in 2000.

By failing affirmatively to act to protect

---

[23] *See King County v. Rasmussen*, 299 F.3d 1077, 1089 (9th Cir. 2002) ("The STB implicitly has answered this question by asserting jurisdiction over the rail line; judicial review of the order must be obtained directly from a court of appeals . . . .").

[24] *See also Simmons v. ICC*, 716 F.2d 40, 42 (D.C. Cir. 1983) ("This circuit has consistently interpreted the phrase 'party aggrieved' to require as a general matter that petitioners be parties to any proceedings before the agency preliminary to issuance of its order."). We note that, despite this

(continued...)

[24](...continued)
rule, two Fifth Circuit cases suggest that nonparties may appeal ICC orders if "the agency action is 'attacked as exceeding the power of the Commission.'" *Am. Trucking Ass'ns*, 673 F.2d at 85 n.4 (quoting *Schwartz v. Alleghany Corp.*, 282 F. Supp. 161, 163 (S.D.N.Y. 1968)); *see also Wales Transp. Co. v. ICC*, 728 F.2d 774, 776 n.1 (5th Cir. 1984).

This line of cases has, however, been squarely rejected by some of our sister circuits. *See, e.g.*, *In re Chicago, Milwaukee, St. Paul & Pac. R.R.*, 799 F.2d 317, 335 (7th Cir. 1986) ("The statute limits review to petitions filed by parties, and that is that."); *Erie-Niagra Rail Steering Committee v. STB*, 167 F.3d 111, 113 (2d Cir. 1999) ("We agree with the Seventh Circuit in *Chicago* and the District of Columbia Circuit in *Simmons*. To the extent that non-parties were once permitted to appeal ICC decisions, that avenue was closed by the clear language of the Hobbs Act when it became applicable to the ICC in 1975.").

[25] The applicable standards and requirements for intervention in a proceeding before the STB are set forth in 49 C.F.R. § 1113.7.

their interests by intervening in the agency proceedings, the landowners cannot now advance their claims in a collateral action that necessarily challenges several agency decisions and orders as being issued after the agency's jurisdiction over the line terminated:

> [I]t is incumbent 'upon an interested person to act affirmatively to protect himself' in administrative proceedings, and . . . [s]uch a person should not be entitled to sit back and wait until all interested persons who do so act have been heard, and then complain that he has not been properly treated.'

*Nader v. Nuclear Regulatory Comm'n*, 513 F.2d 1045, 1054 (D.C. Cir. 1975) (footnotes omitted) (quoting *Red River Broad. Co. v. FCC*, 98 F.2d 282, 286 (D.C. Cir. 1938)).

AFFIRMED.