James A. LATHAM, Plaintiff–Appellant,

v.

WELLS FARGO BANK, N.A., et al., Defendants–Appellees.

No. 89–4432.

United States Court of Appeals, Fifth Circuit.

March 23, 1990.

J. Randall Keene, Shreveport, La., for plaintiff-appellant.

Kent Murdock, Scott R. Clark, Salt Lake City, Utah, for First Sec. Bank.

Richard S. Odom, Daniel D. Rodarte, Susan B. Hall, Brobeck, Phleger & Harrison, Los Angeles, Cal., Sidney E. Cook, James R. Jeter, Kenneth Mascagni, Joseph L. Hargrove, Jr., Glen L. Langley, Shreveport, La., for defendants-appellees.

Before HIGGINBOTHAM, SMITH, and DUHÉ, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

James A. Latham appeals the summary judgment entered in favor of Wells Fargo Bank, N.A. and First Security Bank of Utah, N.A., dismissing his lender liability claims against them on res judicata grounds. The district court held that since Latham's corporations, which were co-borrowers on the loan, had settled their claims against the banks in bankruptcy proceedings, and since Latham controlled these corporations in every aspect of their business, his claims against the banks were barred. We conclude that Latham's claims in this action are in part for injuries he suffered personally in his capacity as co-borrower and as guarantor of LEXCO's and LRC's indebtedness, rather than for injuries suffered as a shareholder from wrongs inflicted on his corporations. The trustees represented the corporations' claims in the bankruptcy proceeding, and Latham cannot now proceed as a shareholder on them; but his interests as a co-borrower and a guarantor were never placed before the bankruptcy court. Summary judgment on res judicata grounds was thus appropriate only for his claims as shareholder. We affirm the summary judgment only to the extent it barred those claims. We reverse the district court to the extent the summary judgment bars Latham's personal claims.

I

Latham was the sole shareholder of Latham Resources Corporation. LRC in turn owned all of the stock of other companies Latham controlled, including Latham Exploration Company, Inc. Through these subsidiaries, Latham engaged in contract drilling for oil, and in oil exploration and production. Latham was either the sole director or controlled the board of directors of each of these subsidiaries. He was also the president of LRC and LEXCO. While Latham conducted all of his business through these companies, he personally maintained title to some of the rigs and equipment they used.

In January 1982, LRC and its subsidiaries, as well as Latham personally, owed Marine Midland Bank approximately $9,000,000. They also owed First Security approximately $15,700,000. These debts were secured by drilling rigs and equipment, some of which were owned by Latham personally, some by the various companies, and some by Latham together with one or more of the companies. About this time, Latham decided to shift his operations' primary emphasis from contract drilling to exploration and production, having recognized that contract drilling was becoming unprofitable. The new emphasis on exploration and production meant that Latham's operations would require more financing than they had in the past. Wells Fargo convinced Latham it would be better able to handle these needs than his financier at the time. One immediate need was a new loan to enable the operations to retire their debts to Marine Midland and First Security.

On April 14, 1982, Latham and each of his companies entered into a Secured Credit Agreement with Wells Fargo and First Security, under which the banks loaned them approximately $27,434,000. Latham and the companies were co-obligors. The agreement's purpose was to refinance the existing indebtedness to Marine Midland and First Security and to provide Latham's operations with an additional $2,000,000 as working capital. As a condition precedent to the Credit Agreement, the banks re-quired Latham individually and each of his companies to pledge certain of their separately owned assets to secure each other's obligation. This collateral consisted principally of chattel mortgages and security interests affecting drilling rigs owned by Latham personally and by his companies other than LEXCO. In his amended complaint, Latham alleged he personally provided 52% of this collateral, and that the total value of the collateral was far less than the amount of the debt. Latham also alleged the parties "understood and anticipated" that Latham and the companies would not be able to make the required principal payments in October 1982, and planned to revise the agreement at a later date.

The recession in the petroleum industry subsequently deepened, and the value of the collateral, particularly the drilling rigs, further declined. This recession also spurred Latham to accelerate his shift in emphasis to exploration and production. He set out to do this by using LEXCO to raise drilling dollars through limited partnerships, and by causing LEXCO to undertake exploration and development drilling in its own name. As part of this effort, LEXCO entered into a farmout agreement with Chevron in May 1982, under which it agreed to drill five Tuscaloosa trend wells in Point Coupee Parish, Louisiana in exchange for leasehold rights in the wells. LEXCO, through Latham, convinced several investors to provide equipment, services, or funds in exchange for "working interests" in LEXCO's leasehold rights upon completion. The investors provided mostly non-monied assets, which left LEXCO with a shortage of working capital.

The agreement required LEXCO to meet a strict drilling schedule and provided substantial liquidated damages if it did not. To keep from falling behind, LEXCO began work on the wells without sufficient funds to complete the job. In his amended complaint, Latham alleged that before LEXCO executed the Chevron contract, Wells Fargo and First Security also agreed to revise the Secured Credit Agreement and advance LEXCO sufficient funds to perform its obli-

gation to Chevron. Latham alleged that these advances were to be secured by the leasehold interests, but that the advances were never made. LEXCO instead obtained a $2,000,000 loan from American Bank and Trust Company in New Orleans, secured by a mortgage on the first well completed. This still did not provide sufficient capital, primarily because when Latham asked Wells Fargo and First Security to subordinate their secured position, they agreed to do so only if LEXCO would apply a "substantial portion" of the American loan proceeds to the debt owed them. Latham alleged he agreed to this based on the banks' assurances that the Secured Credit Agreement would soon be amended and the banks would finally advance the funds they had promised LEXCO earlier.

The banks still had not advanced any money by January 1983, and Latham's operations began to encounter serious financial difficulties because LEXCO was unable to pay for the drilling and completion of the wells. Trade creditors began to file mechanic's and materialmen's liens against the wells. LEXCO nevertheless was able to complete the wells due in large part, Latham said, to the trade creditors' respect for him.

On April 28, 1983, the banks executed a commitment letter in which they committed to lend an additional $5,500,000 to Latham and the companies on certain conditions. In the amended complaint, Latham alleged he and the companies met each of the conditions the banks did not waive.

Pursuant to the letter, the banks entered into a third amendment to the Secured Credit agreement with Latham and the companies. The banks agreed to increase the loan by the $5,500,000 to which the letter referred. Latham and the companies were to use the proceeds to repay existing past due indebtedness, to pay liens, and for working capital. The amendment required LEXCO to pay the $3,500,000 interest on the past due indebtedness by assigning the banks a $6,529,852 production payment on the Tuscaloosa wells. The banks required Latham and his companies to secure this new advance, and the pre-existing indebted-

ness, with other collateral. This collateral included Latham's partnership interests in the LEXCO 82–2 program, and various other drilling programs. Finally, the banks agreed to release the collateral to the extent LEXCO elected to sell working interests in the wells. Latham alleged that the banks later refused to release the collateral.

On May 6, 1983, Wells Fargo executed another commitment letter in which it agreed either to lend Latham and the companies another $2,000,000 per Tuscaloosa well for completion costs or to subordinate its secured position to allow them to find other financing for those costs. According to the amended complaint, Wells Fargo did neither.

By September 1983, LEXCO owed its trade creditors more than $20,000,000 for labor, materials, and services furnished in the drilling and completion of the wells. The producing wells had generated several million dollars, but Chevron held these funds in escrow because of the liens LEXCO's trade creditors held on the wells. Chevron also refused to convey the leasehold rights to LEXCO and sued to terminate the farmout agreement because of these liens.

LEXCO filed for reorganization under Chapter 11 on October 17, 1983. The bankruptcy court appointed a trustee on the motion of Wells Fargo, First Security, and Chevron. In the fall of 1986, the bankruptcy court approved LEXCO's plan for reorganization, which included settlement of its claims against the banks. This plan was a joint plan for reorganization proposed by LEXCO's trustee and some of its creditors.

LRC later filed for bankruptcy under Chapter 7. On May 27, 1988, the bankruptcy court, pursuant to a request by the trustee for LRC, auctioned LRC's claims against the banks. A subsidiary partnership affiliated with First Security bought the claims for $12,000.

In the meantime, on October 13, 1987, Latham filed this suit. He filed his amended complaint on December 14, 1987. The banks moved alternatively for dismissal or summary judgment, urging that Latham's

action was barred by res judicata. They argued that the settlement of the corporations' claims in the bankruptcy proceedings precluded the suit. The district court agreed and entered summary judgment for the banks.

## II

We stated the doctrine of res judicata—claim preclusion—in *Nilsen v. City of Moss Point, Miss.*, 701 F.2d 556, 559 (5th Cir. 1983) (en banc) (quoting *Kemp v. Birmingham News Co.*, 608 F.2d 1049, 1052 (5th Cir.1979)):

> For a prior judgment to bar an action on the basis of res judicata, the parties must be identical in both suits, the prior judgment must have been rendered by a court of competent jurisdiction, there must have been a final judgment on the merits and the same cause of action must be involved in both cases.

■ Both Latham and the banks focus their arguments primarily upon whether Latham's relationship with LRC and LEXCO was sufficiently close to place him in privity with them. We noted in *Southmark Properties v. Charles House Corporation*, 742 F.2d 862, 869 (5th Cir.1984), that "parties" for purposes of res judicata does not mean formal, paper parties only, but also includes " 'parties in interest, that is, that persons whose interests are properly *placed before the court* by someone with standing to represent them are bound by the matters determined in the proceeding.' " (quoting 1B J. Moore, *Moore's Federal Practice*, P.O. 411[1] at 390–391 (2d ed. 1983)) (emphasis supplied). A non-party is in privity with a party for res judicata purposes in three instances. First, if he has succeeded to the party's interest in property, he is bound by prior judgments against the party. Second, if he controlled the prior litigation, he is bound by its result. Third, he is bound if the party adequately represented his interests in the prior proceeding. *Benson & Ford, Inc. v. Wanda Petroleum*, 833 F.2d 1172 (5th Cir. 1987); *see also Southwest Airlines Co. v. Texas International Airlines*, 546 F.2d 84 (5th Cir.), *cert. denied*, 434 U.S. 832, 98

S.Ct. 117, 54 L.Ed.2d 93 (1977). The banks contend that Latham controlled the corporations' bankruptcy proceedings and that his interests were adequately represented.

The parties agree that in his business, Latham and his corporations were indistinguishable. Dealing with the corporations meant dealing with Latham; the corporations were but the formal means, convenient for tax purposes among other things, through which Latham ran his operations. But his control, in the full sense of the word, could not extend to these bankruptcy proceedings. It is true that the trustees, the creditors, and the court dealt with Latham; no one else purported to represent the corporations. It is also true that he detailed for the trustees the corporations' claims against the banks and urged their pursuit. But for res judicata purposes, control must be viewed in light of our definition of privity set out in *Southmark*; that is, the non-party's control must be such as to place his interests before the court. Adequate representation must do the same thing; if it does not, there can be no bar, even for entities as closely aligned as Latham and the corporations are here. We turn to that inquiry.

First, the preclusive effect of a bankruptcy decree must reflect the reality of its limited jurisdiction. In *Northern Pipeline Construction Co. v. Marathon Pipeline Co.*, 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982), the Court held the jurisdictional provision of the 1978 Bankruptcy Reform Act unconstitutional because it impermissibly vested Article III judicial powers in bankruptcy judges, whose positions Congress created under Article I, and who did not enjoy Article III's life tenure and guaranteed compensation protections. Specifically, the Court held that a bankruptcy court could not adjudicate a debtor's claims for breach of contract and breach of warranty against a private entity. The plurality opinion, per Justice Brennan, suggested that bankruptcy courts could only adjudicate core proceedings, that is, matters involving "the restructuring of debtor-creditor relations." 458 U.S. at 71, 102 S.Ct. at 2871.

■ The Court did not expressly decide whether "core" proceedings could be adjudicated by a bankruptcy court. Indeed, Justice Brennan's suggestion that they probably could did not command a majority of the Court, for Justices Rehnquist and O'Connor, concurring in the judgment, did not reach the issue. Nevertheless, in 1984 Congress responded with a new jurisdictional provision, now codified at 28 U.S.C. § 157, tailored to the plurality opinion. Lower federal courts have presumed its constitutionality. It empowers a bankruptcy judge to "hear and determine all cases under title 11 and all core proceedings arising under title 11, or arising in a case under title 11." 28 U.S.C. § 157(b)(1). A bankruptcy judge may hear a non-core proceeding and make proposed findings of fact and conclusions of law to the district court, but he may not enter a final order or judgment. 28 U.S.C. § 157(c)(1). Thus, if Latham's personal claims against the banks would not have presented a core proceeding in LEXCO's or LRC's bankruptcy proceedings, his personal interests could not have been properly placed before that court for decision. We are persuaded his claims would not have fallen within the core proceeding grouping.

In *Matter of Wood*, 825 F.2d 90 (5th Cir.1987), we concluded that "a proceeding is core under section 157 if it invokes a substantive right provided by title 11 or if it is a proceeding that, by its nature, could arise only in the context of a bankruptcy proceeding." *Id.* at 97. Whatever the difficulties of determining core status in other contexts, our case is not close. Latham's personal claims would not invoke substantive rights provided by title 11, nor do they arise only in the context of bankruptcy proceedings. They are mostly state law contract claims, and also include claims under the federal Bank Tying Act. These are precisely the kinds of claims *Northern Pipeline* established Congress could not commit to the bankruptcy courts for adjudication.

Second, a discharge of the corporations would not have operated to discharge Latham's personal debt or his debt as a guarantor. 11 U.S.C. § 524(e) provides that "discharge of a debt of the debtor does not affect the liability of any other entity on, or the property of any other entity for, such debt."

Of course, Latham could have participated in the formulation of the LEXCO reorganization plan and the motion to auction LRC's claims, while representing these interests. There is a strong argument that if Latham had done so, and in the process compromised his personal claims, the orders confirming the plan and authorizing the auction would be preclusive. *See Republic Supply Co. v. Shoaf*, 815 F.2d 1046, 1050 (5th Cir.1987). But Latham did not do so.

The district court's reliance upon *Southmark* is misplaced. In *Southmark*, we addressed the preclusive reach of an order of sale and confirmation entered in 1975 by a United States District Court in a Chapter 10 proceeding under the old Bankruptcy Act. We held that Craig and the Charles House could not, in later litigation, undermine the order of the district court that they had agreed to. We rejected the suggested limitations of *Northern Pipeline Const. v. Marathon Pipeline Co.*, 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982), observing that the trial court, there a district court, not a bankruptcy court, would have had full jurisdiction to entertain the Corporation's trustee's counter to the claims of Southmark, a secured creditor.

But, unlike Craig, Latham did not participate and the claims held by the court below to be precluded could not have been entertained by the bankruptcy court. In sum, the holding in *Southmark* does not apply here. Latham's personal claims are not barred, and we must reverse the order dismissing them and remand this case to the district court to allow them to proceed.

■ Latham's amended complaint does not in terms distinguish his personal claims from his shareholder claims. The district court can sort this out in pretrial proceedings. We emphasize that Latham's personal interests for these purposes cannot extend beyond the value of the collateral he personally owned, the injury to his busi-

ness reputation, and his resulting personal distress. He may not assert a claim that the injuries done to LRC and LEXCO also injured his entire operation, thereby harming him personally. To the extent such a claim would be for his personal losses directly attributable to the demise of LRC and LEXCO it would be derivative; to the extent it would be for damage done to his other companies, Latham does not purport to represent them in this litigation. We express no opinion regarding the merits of any of Latham's claims.

### III

We reject Latham's argument that the bankruptcy proceedings did not result in final judgments on the merits. We need not consider Latham's argument that if his personal claims were barred, his wife would still be able to press half of them because they are community property under Louisiana law.

AFFIRMED in part and REVERSED and REMANDED in part.