**PETRO–HUNT L.L.C., et al,**

v.

**UNITED STATES of America, et al.**

**No. Civ.A.00–0303.**

United States District Court,
W.D. Louisiana,
Shreveport Division.

Dec. 18, 2001.

John M. Wilson, Craig Wyman, J Patrick Morris, Jr., Liskow & Lewis, J Ralph White, Jonathan W. Thames, Montgomery Barnett et al, New Orleans, LA, Jay A. Greenleaf, Jonathan D. Baughman, Shreveport, LA, for Petro–Hunt LLC.

John M. Wilson, Craig Wyman, J Patrick Morris, Jr., Liskow & Lewis, John Mason McCollam, Matthew Joseph Randazzo, III, Jonas Peyton Baker, Gordon Arata et al, New Orleans, LA, Jonathan D. Baughman, Shreveport, LA, for Hunt Petroleum Corp. and Kingfisher Resources Inc.

Herman E. Garner, Jr., Patrick Stephen Ottinger, Ottinger Hebert et al, Lafayette, LA, for Sante Fe Snyder Corp and Devon S F S Operating Inc.

Nancy S Degan, Edward B. Poitevent, II, Evans M. McLeod, Walter J. White, Phelps Dunbar et al, New Orleans, LA, for Aspect Resources LLC, M B Exploration LLC and Ocean Energy Resources Inc.

Jeffrey W. Weiss, Wiener Weiss & Madison, Shreveport, LA, for Caruthers Producing Co. Inc.

Jeffrey K. Smith, Texaco Inc. Legal Dept., New Orleans, LA, for Catawba Energy Inc., Rice & Associates LLC and Texaco Exploration & Production Inc.

E. Nicholas Milam, Evanston, IL, for First Texas Hydrocarbons Inc.

David L. Smelley, Hargrove, Pesnell & Wyatt, Shreveport, LA, for Palmer Petroleum Inc. and TMR Exploration Inc.

R. Joseph Wilson, Gaharan & Wilson, Jena, LA, for Justiss Oil Co. Inc.

Howell R. Spear, Pensacola, FL, pro se.

M. Taylor Darden, Robert S. Stassi, John C. Martin, Carver Darden et al., New Orleans, LA, for John P. Strang.

James Fleet Howell, Shreveport, LA, for Wheless T D L Exploration Co., LLC.

J Bradley Jeffreys, San Diego, CA, pro se.

### *MEMORANDUM RULING*

WALTER, District Judge.

Before this Court is a Motion for Summary Judgment [Doc. 85] and a Reply to Defendant's Opposition to Plaintiff's Motion for Summary Judgment [Doc. 142], filed on behalf of the Plaintiff, Petro–Hunt, L.L.C., Hunt Petroleum Corporation, and

Kingfisher Resources, Inc. (Petro–Hunt), pursuant to Federal Rule of Civil Procedure 56. Defendants, United States of America, et al., oppose the Motion [Doc. 133].[1] For the reasons assigned herein, Plaintiff's motion is GRANTED and Plaintiffs, Petro–Hunt, L.L.C., Hunt Petroleum Corporation and Kingfisher Resources, Inc. are hereby declared the exclusive owners in perpetuity of the approximately 180,000 acres of mineral servitudes at issue in this case and being more fully described in Plaintiff's Complaint [Doc. 1].

## BACKGROUND

The case at bar cannot be properly framed without an examination of the Fifth Circuit's *United States v. Nebo Oil Co.*[2] opinion, as it provides both the historical backdrop and the grounds for Petro–Hunt's pivotal assertion of *res judicata* and/or claim preclusion.[3] This Court includes the following lengthy, but relevant, quotations because it reflects the view of a panel of judges much closer in time and in possession of the full record:

This suit was brought by the appellant, United States of America, against the appellee, Nebo Oil Company, Inc., for a judgment declaring that appellant is the owner of the minerals ... underlying approximately eight hundred acres of land located in the Parish of Natchitoches, States of Louisiana. A trial was had by the court without a jury and judgment was entered dismissing the complaint.

The undisputed facts are these: In the year 1932 five lumber companies decided to pool the mineral rights in their lands in order to secure more favorable exploration and development thereof, it being agreed by the parties that each would share in any production obtained from the pooled acreage in proportion to the acreage which each lumber company contributed to the pool.

1. The number and relationship of the co-defendants with the United States of America requires a comment. Though this Court is not presented with any contractual disputes (cross-claims) between mesne defendants and the United States, the fate of certain leaseholds obtained by the various defendants hinges upon the ownership of the various mineral servitudes, which is distinctly at issue in this case. Article 114 of the Louisiana Mineral Code (La.R.S. § 31:114) states, "A mineral lease is a contract by which the lessee is granted the right to explore for and produce minerals." Though the mineral lease has been characterized in a seemingly conflicting manner, as being both a real right and giving rise to a contractual relationship (*See* comment to La.Min.Code art. 16), none would dispute that a valid mineral lease must be originally obtained from a lessor having an executive or ownership interest in the underlying mineral rights (*See* La.Min.Code art. 116) or one who thereafter acquires such an interest (*See* La.Min.Code arts. 144 & 145). All named defendants claim to own rights as lessees (and likely also as assignees), which are dependant upon the United States, as lessor, ultimately having an executive or ownership interest in the mineral rights at issue. Such is evidenced by plaintiff's motion to pretermit entry of judgment by default against certain defendants other than the United States, until the Court settles the title dispute between it and the United States [Doc. 58] and by certain defendant's adoption by reference of the briefs of the United States [Docs. 123, 126 & 131]. Simply put, the various defendants interests are, for the moment, aligned with the United States and ultimately dependant upon the United States prevailing. Therefore, for clarity's sake, this Court will not delve into contractual relationships between the various defendants and the United States and, for purposes of this memorandum, will refer to and treat the defendant, as being the United States.

2. 190 F.2d 1003 (5th Cir.1951).

3. While *res judicata* generally refers to claim preclusion, it is sometimes used when referencing issue preclusion. For purposes of this Memorandum, use of *res judicata* is synonymous with claim preclusion.

For that purpose, the Good Pine Oil Company was organized.... 

One of these conveyances to Good Pine Oil was by recorded deed from the Bodcaw Lumber Company, dated November 12, 1932, covering all of the oil, gas and sulphur underlying a tract of land containing 37, 532.13 acres of which the 800 acres of land here involved was a part.

Prior to the year 1936 the United States was interested in purchasing lands in Louisiana for national forest purposes and had found that owners of large tracts of land were unwilling to sell their lands because of court decisions holding that the sale or reservation of mineral rights in Louisiana created only a right in the nature of a servitude which was subject to prescription by ten years nonuser [sic]. However, the United States Department of Agriculture, Forest Service, was not in accord with this view and on May 29, 1935, submitted to Bodcaw Lumber Company an opinion of the Assistant Solicitor of the Department of Agriculture to the effect that the prescriptive provisions of the Louisiana Civil Code would not apply to lands sold to the United States for national forest purposes.

Thereafter, on February 11, 1936, Bodcaw sold to the United States a tract of timber land containing 24,943.93 acres, of which the 800 acre tract whose minerals had previously been conveyed to Good Pine Oil formed a part.... 

At the time the sale was made, the officers and directors of Bodcaw believed that the mineral rights in the lands sold were valuable and the price of $1.75 per acre paid by appellant for the timber lands acquired under the 1936 deed did not reflect the value of any mineral rights. Moreover, the uncontradicted testimony is that Bodcaw would not have sold the timber lands to the United States had its representatives then taken the position, as they do now, that the prescriptive provisions of the Louisiana Civil Code would be applicable to the lands sold.

In December 1941 the Good Pine Oil Company was dissolved .... [and] Nebo Oil Company, was organized and by mesne conveyances acquired all of the mineral rights formerly held by Good Pine Oil.

It was stipulated by and between the parties that no drilling operations have been conducted on the 800 acres of land involved or on lands contiguous thereto. However, it appears that the mineral rights acquired by Good Pine Oil by virtue of the 1932 deed from Bodcaw were exercised by the drilling of five separate wells between October 1941 and October 1948, three of which were located on lands conveyed to the United States under the 1936 deed from Bodcaw.... 

The gravamen of the complaint is that no drilling operations were conducted on the lands in suit during the ten years period beginning November 12, 1932; and that consequently any mineral rights owned by Good Pine Oil or its successor, Nebo Oil, had prescribed by ten years of nonuser [sic] of the servitude. For answer, Nebo Oil denied that the mineral rights had prescribed and set up the defenses, among others, that there had been an interruption of the ten year prescriptive period for the reason that the minerals underlying the 800 acre tract were pooled with other minerals which had been developed, and exercise of the servitude on any part of the pooled acreage interrupted prescription with respect to all of the minerals included in the pool; and that the mineral rights were imprescriptible by virtue of

Act 315 of the Louisiana Legislature of 1940.[4]

The Court first rejected Nebo Oil's defense that the pooling of the lands interrupted prescription, finding that the pooling agreement was never recorded and thus could not affect third parties.[5]

Next, the Court addressed the Constitutionality of Act No. 315 of 1940, which derogated from the default rules applicable to the extinguishment of mineral servitudes and established a rule of imprescriptability for those servitudes burdening lands purchased or expropriated by the United States.[6] The Court found that Act 315 was retroactively applicable, "because of the general rule of law established by the jurisprudence of this State that laws of prescription and those limiting the time within which actions may be brought are retrospective in their operation."[7] The Court further found that the scheme of acquisitive prescription cannot give rise to a vested right and is "nothing more than a mere expectation, or hope, based upon an anticipated continuance of the applicable general laws."[8] The court concluded "that this so-called 'reversionary interest' is nothing more than a mere expectancy, or hope, based upon an anticipated continuance without change of the applicable laws of prescription and cannot be regarded as a vested right protected by the Constitution."[9]

· The *Nebo* Court concluded with the following broad statement:

Act 315 of 1940 provides that when lands are conveyed to the United States so acquired is by the act of acquisition conveyed subject to a prior sale or reservation of oil, gas and/or other minerals or royalties, still in force and effect, said rights so reserved or previously sold shall be imprescriptible."

---

4. *Id.* at 1005–06.

5. *Id.*, at 1007. The Court likely addressed this issue first and directly because of basic abstention doctrine concerns. If the Court had found interruption of prescription by pooling it could have avoided the constitutional questions presented. Otherwise, one could view the interruption of prescription by pooling as a moot issue in light of the Court's application of Act 315 to the servitude at issue. Approaching this from a *res judicata* perspective, as opposed to a Constitutional mindset, such an issue or other issues relating to prescription need not be addressed first and may be properly viewed as moot in the event *res judicata* is held to bar such a claim. Therefore, this Court need not entertain plaintiff's motion for summary judgment on alternative grounds of interruption of prescription [Doc. 88] nor defendant's contentions in such regards.

6. Act 315 of 1940 reads in pertinent part, to wit: "Section 1. Be it enacted by the Legislature of Louisiana, That when land is acquired by conventional deed or contract, condemnation or expropriation proceedings by the United States of America, or any of its subdivisions or agencies, from any person, firm or corporation, and by the act of acquisition, verdict or judgment, oil, gas, and/or other minerals or royalties are reserved, or the land

7. *Id.* at 1008 (*citations omitted*). Stating that the statute was retroactively applied is a bit of a misnomer. Act 315 of 1940 was merely applied from the moment of its legislative birth, with the result that application in 1940 may have had retroactive effect upon previously contemplated contractual or legislatively authorized expectations. Put squarely, those outstanding mineral servitudes which had not prescribed at the time Act 315 of 1940 was enacted would never prescribe and the hopes of the surface owner would have been defeated. All the outstanding, yet unprescribed, mineral interests were now made imprescriptable. True retroactive application would have meant that prior mineral rights which had prescribed to the governmental landowner would have been undone. This is not what happened, as such rights would have been "vested."

8. *Id.*

9. *Id.* at 1009. The Court also found that Act 315 of 1940 did not run afoul of the Contract Clause of the U.S. Constitution. *Id.*

subject to a prior sale or reservation oil, gas, or other minerals still in force and effect, the rights so reserved or previously sold shall be imprescriptible. It does not state or imply that the reserved rights shall be increased or varied but only that they shall not be lost by prescription. The consideration of $1.75 per acre paid by the United States did not cover the value of any mineral rights. Indeed, since the mineral underlying the lands had previously been sold to Good Pine Oil without limit for time of their enjoyment, Bodcaw did not own any minerals which it could sell to the United States. Neither could it reserve nor sell the expectation of a servitude lapsed for nonuser [sic].... All that Bodcaw had which it could sell to the United States was the timber land itself. That was the obligation of the contract and it remains unimpaired. By virtue of its ownership of the land appellant could merely hope that the outstanding mineral servitude might lapse but this hope or expectancy was born or a statute of prescription based on the then existing public policy of the State as declared by its legislature. It was not a part of the obligation of the contract. It was wholly given by law and the power that gave it could increase, diminish, or otherwise alter, or wholly take it away without violating the Federal Constitution.

Judgment affirmed.[10]

From November 1934, through January 1937, the United States acquired, pursuant to the Weeks Act,[11] approximately 180,000 acres of land located in Grant, Winn and Natchitoches Parishes from Bodcaw Lumber Company and Grant Timber & Manufacturing Company. This was accomplished through eleven different conveyances—nine deeds and two expropriation judgments (Def.'s Opp. Mot.Summ.J. ¶ B, Ex's. 1–11 [Doc. 133] ). Prior to that, from November 1932, through May 1934, Good Pine Oil Company acquired the mineral rights to the 180,-000 acres described above, pursuant to six mineral conveyances (Id., Ex's. 12–17). At the time of the acquisitions, all of the lands acquired by the United States were clearly burdened by the six mineral servitudes running in favor of Good Pine Oil Company (Id., ¶ B and Def.'s Resp.Pl.'s Stat. Uncontested Fact ¶ 5 [Doc. 134] ). In 1948, when the United States filed suit for declaratory judgment, Nebo Oil Company was the successor in interest to all of the Good Pine Oil Company's then outstanding mineral rights. The United States does not dispute that the current plaintiffs, via various conveyances, are successors in interest to the mineral servitudes that had been previously owned by Good Pine Oil and later Nebo Oil Company (Def.'s Opp.Mot.Summ.J. ¶ B and Def.'s Resp.Pl.'s Stat. Uncontested Fact ¶ 3).

Based on the *Nebo Oil* Fifth Circuit opinion and the stipulated facts, there can be no real dispute that: (i) At the time Act 315 of 1940 was enacted the United States owned the surface of the 180,000 acres at issue, which were burdened by mineral servitudes running in favor of Good Pine Oil Co.; (ii) In 1948, the United States sought a declaratory judgment against Nebo Oil Co. on 800 acres; (iii) The Fifth Circuit found that Act 315 of 1940 was applicable to the minerals underlying the 24,943.93 acre tract of land sold to the United States, of which the 800 acres was a part, and that those minerals were im-

**10.** *Id.* at 1010.

**11.** 1911, 36 Stat. 961 (codified in various sections of Title 16 U.S.C.). This is the en-

abling legislation for the National Forest System.

prescriptible;[12] and (iv) plaintiffs are the current successors in interest to whatever outstanding mineral rights Good Pine Oil Co. originally acquired.

In 1972, the Supreme Court decided *Little Lake Misere*.[13] *Little Lake* established that Act 315 of 1940 did not apply to mineral servitudes burdening lands acquired by the United States pursuant to the Federal Migratory Game Bird Act. The Court used federal choice of law principles (particularly the *Clearfield Trust*[14] Doctrine) in refusing to apply Act 315 of 1940.[15] Instead, the Court applied the residual prescription rule of ten years nonuse.[16]

In 1991, forty years after *Nebo Oil*, and almost twenty years after *Little Lake*, the United States Bureau of Land Management apparently took notice of the *Little Lake* opinion and began leasing and/or attempting to lease portions of the 180,000 acres at issue, as to which plaintiff's claim ownership in perpetuity (Pl.'s Compl. ¶ 14, Ex. E [Doc. 1] and Def.'s Answer ¶ 14 [Doc. 17] ). In February 2000, after many letters of protest and exchanges with the United States (Pl.'s Compl. ¶ 15 and Def.'s Answer ¶ 14), Petro–Hunt filed this Quiet Title action pursuant to 28 U.S.C. §§ 2201 and 2409, seeking to be declared the owners of the mineral servitudes in perpetuity and declaring the leases granted by the United States a nullity (Pl.'s Compl. ¶ 18).

## SUMMARY JUDGMENT STANDARD

Under Fed.R.Civ.P. 56(c), summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." A fact is "material" if it may affect the outcome of the suit under governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). An issue is "genuine" if there is sufficient evidence so that a reasonable jury could return a verdict for either party. *Id.*

The moving party bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, admissions, and/or affidavits which it believes demonstrates the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Lawrence v. Univ. of Tex. Med. Branch at Galveston*, 163 F.3d 309 (5th Cir.1999). The moving party is not required to negate the elements of the non-moving party's case. *Lawrence*, 163 F.3d at 311. However, where the moving party bears the burden of proof on an issue, it must produce evidence that would, if uncontroverted at trial, warrant a judgment as a matter of law. *Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1264–65 (5th Cir.1991).

Once the moving party carries its initial burden, the burden then falls upon the non-moving party to demonstrate the existence of a genuine issue of material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 584–88, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986). The non-moving party "must go beyond the pleadings and designate specific facts in

**12.** *See* discussion and quotation of *Nebo Oil supra.*

**13.** 412 U.S. 580, 93 S.Ct. 2389, 37 L.Ed.2d 187 (1973).

**14.** 318 U.S. 363, 63 S.Ct. 573, 87 L.Ed. 838 (1943).

**15.** 412 U.S. at 591–94, 93 S.Ct. 2389.

**16.** 412 U.S. at 604, 93 S.Ct. 2389.

the record showing that there is a genuine issue for trial." *Wallace v. Texas Tech. Univ.*, 80 F.3d 1042, 1047 (5th Cir.1996) (citations omitted). This burden is not satisfied with some metaphysical doubt as to the material facts, by conclusory or unsubstantiated allegations, or by a mere scintilla of evidence. *Little v. Liquid Air. Corp.*, 37 F.3d 1069, 1075 (5th Cir.1994) (citations omitted). In the absence of any proof, the court will not assume the non-moving party could or would prove the necessary facts. *Id.*

Pursuant to Local Rule 56.1, the moving party shall file a Statement of Uncontested Facts as to which it contends there is no genuine issue to be tried. Local Rule 56.2W requires that a party opposing the motion for summary judgment set forth a "short and concise statement of the material facts as to which there exists a genuine issue to be tried." All material facts set forth in the statement required to be served by the moving party "will be deemed admitted, for the purposes of the motion, unless specifically denied." Local Rule 56.2W.

## LAW AND ANALYSIS

### A. Framing this case properly for purposes of *res judicata* analysis.

#### 1. *Numerosity of servitudes addressed.*

The United States suggests that the 800 acre servitude involved in Nebo Oil is "one of 96 servitudes that, at one time, burdened the approximately 180,000 acres at issue in this case .... [and that] [e]ach mineral servitude involves a separate nucleus of operative fact." They further state that the "96 servitudes have different drilling and production histories." (Def.'s Opp.Mot.Sum.J. pp. 15–16 [Doc. 133]).[17]

This Court does not believe that 96 separate or mini-trials are necessary for the resolution of the issue of *res judicata.* None of the servitudes had been outstanding for longer than 8 years upon the enactment of Act 315 of 1940. Therefore, this Court could not address prescription issues if *Nebo Oil*, and more specifically Act 315 of 1940, were to have preclusive effect between these parties, as none of the mineral servitudes would have ever prescribed.

#### 2. *Ripeness addressed.*

The United States also raises the issue of ripeness. In the end, like prescription, it is of no import if *res judicata* is to apply. There was no reason for the United States to wait ten years to litigate title to property whose owners claimed it would never prescribe. The issue of the application of Act 315 of 1940 was actually litigated to a conclusion. Hypothetically, if Act 315 of 1940 had been held inapplicable or unconstitutional in *Nebo Oil*, it is extraordinary to imagine that either party would have thereafter though that Act 315 of 1940 applied to any of the other factually similarly mineral servitudes. In such an event, Nebo Oil Co. would have understood that its other outstanding mineral servitudes were subject to the default rule of ten year prescription of non-use. The converse is also true and the actions of the parties for forty years after the *Nebo Oil* opinion demonstrate such.

#### 3. *Contractual language—the conveyances giving rise to the mineral servitudes and mineral reservations are similar and not subject to varying interpretation.*

The operative language in all six mineral servitudes is virtually identical and all six

---

17. The United States apparently arrived at this figure by looking at the number of mineral conveyances, number of acquisition deeds, contiguous acreage estimations and various drilling and production data.

would have been consistently interpreted under the pre-Mineral Code law—as giving rise to an ordinary mineral servitude, which was subject to prescription for ten years non-use.[18] There is nothing remarkable about the language creating these particular mineral servitudes. In regards to prescription, one of the only meaningful things the parties could have done (if not also surface owners), would have been to stipulate a shorter prescriptive period than the applicable ten years. This, nor anything apart from the default rules was intended.

Turning to the mineral reservations in the conveyances to the United States (not the mineral servitudes discussed above), the government attempts to create a title quandry—"four of the deeds and one judgment, including the February 11, 1936 deed involved in Nebo Oil, created reversionary interests in the vendor if the servitudes held by Good Pine Oil prescribed, while the remaining conveyances contained no such provision." (Def.Opp.Mot.Summ.J. pg. 13 [Doc.

133] ). This factual segue by the government is misleading. The attorneys who drafted such mineral reservations undoubtedly understood that Louisiana mineral law does not support reversionary interests and were also undoubtedly attempting, as with any zealous advocate, to reserve their rights to the full extent of the law.[19] This Court examined the language referenced by the United States and finds nothing remarkable. The different clauses simply represent an elaboration of basic principles of mineral law, *e.g.*, what it takes to interrupt prescription. In other words, these were just two different versions of "plain-vanilla," boilerplate, mineral reservation language.

This Court finds that all of the mineral servitudes and reservations would be given the same effect under Louisiana law. None of the clauses utilized are so substantially different that they would give rise to some interpretation and application inconsistent with the default rules for mineral servitudes or with the mineral servitude and reservation at issue in *Nebo Oil.*

**18.** *See* the oft-cited case *Frost–Johnson Lumber Co. v. Salling's Heirs*, 150 La. 756, 91 So. 207 (1920) and its progeny, for the creation and recognition of the mineral servitude. Under clear jurisprudence at the time, the mineral servitude was (and still is) a fixed beacon, unique to Louisiana law. Persons have in vain attempted to circumvent and impose permanent dismemberments of title (which is allowed in Texas and many other states), but this is only achievable in Louisiana by legislative fiat, such as in Act 315 of 1940.

**19.** As found by the Court of Appeals in *Nebo Oil,* "Prior to the year 1936 the United States was interested in purchasing lands in Louisiana for national forest purposes and had found that owners of large tracts of land were unwilling to sell their lands because of court decisions holding that the sale or reservation of mineral rights in Louisiana created only a right in the nature of a servitude which was subject to prescription by ten years nonuser

[sic]. However, the United States Department of Agriculture, Forest Service, was not in accord with this view and on May 29, 1935, submitted to Bodcaw Lumber Company an opinion of the Assistant Solicitor of the Department of Agriculture to the effect that the prescriptive provisions of the Louisiana Civil Code would not apply to lands sold to the United States for national forest purposes." What would have created factual dissimilarities in these mineral reservations is if the drafters of these documents had included language about the aforementioned opinion of the Department of Agriculture. Including such language under the impression, albeit now a mistaken one, that the United States government was guaranteeing permanent severability of the minerals, would have lent itself to further examination and would have warranted the United States' invocation of alleged factual differences.

*4. The issue of the applicability of Act 315 of 1940 has been litigated.*

Through its actions, the United States has demonstrated that it no longer feels that the *Nebo Oil* judgment holds sway, even between parties in privity. This Court is addressing *res judicata.* Had the United States sought to litigate other mineral servitudes, underlying other parcels of land not related to the *Nebo Oil* litigation, the mineral servitude owners would not have cried preclusion or *res judicata,* they would have merely pointed to the fact that the case law was in their favor. In fact, this did occur in Cameron Parish in 1972 on lands acquired under the Federal Migratory Game Bird Act. Unsurprisingly, defendants in that litigation pointed to *Nebo Oil,* but this time the Court found Act 315 of 1940 was not applicable to then outstanding mineral interests and held that the default rule of prescription by ten years non-use applied.[20]

■ New decisional law was made, and now, some forty years later, the United States is using the *Little Lake Misere* case as a buffer for what it undoubtedly could not have done prior to *Little Lake Misere.* This two step approach does not short circuit the application of *res judicata,* especially in the realm of real property. The United States is relying on a change of law to undo a prior case—not merely attack the holding or decline to follow it in future litigation, but actually attempting to undo its effects, as between the parties. That is not to say that the United States has to continue to apply the holding of *Nebo Oil* in current mineral servitude disputes, merely that it cannot undo the effects of that judgment between it and the privies of Nebo Oil Co.

*5. This judgment specifically addresses res judicata / claim preclusion—all other arguments / contentions are moot.*

This Court restates that it does not need to delve into such matters as what constitutes contiguous tracts, the number of servitudes, and whether prescription of nonuse was interrupted by good faith operations for the discovery and production of minerals. All such considerations are rendered moot by the Court's finding that *res judicata* is applicable to the entirety of this case.[21]

Unlike an analysis of prescription, contiguous acreage, or good faith drilling operations, this Court is faced with what may be viewed as a primarily legal question. The basic facts as to the location of the property in dispute and who are the ancestors in title to Nebo Oil Co. are not in dispute. What is in dispute is the preclusive effect of the *Nebo Oil* decision. Therefore, this issue is particularly ripe for disposition by summary judgment.

**B. *Res Judicata* takes on increased importance in the realm of real property.**

■ The doctrine of claim preclusion embodies a "fundamental precept of common-law adjudication," which holds that a claim or issue which parties had a full and fair opportunity to litigate should, after judgment, forever be put to rest as between those parties.[22] Likewise, the pub-

20. *See* discussion of *Little Lake Misere* on pg. 675, *supra.*

21. *See supra* note 5.

22. *Montana v. United States,* 440 U.S. 147, 153, 99 S.Ct. 970, 973, 59 L.Ed.2d 210 (1979). A non-exclusive list of policies supporting claim preclusion are (i) to promote fairness; (ii) to prevent inconsistent judgments and to achieve uniformity and certainty; (iii) to finalize disputes among the parties; and (iv) to conserve judicial resources. Jay Carlisle, "Second Circuit 1999–2000 Res Ju-

lic's interest in the reliability and certainty of titles to real property is substantial and requires efficient and decisive resolution. Therefore, in matters pertaining to real property, these two interests combine to encourage strict application of the claim preclusion doctrine. This Court could not have improved on the words of the Supreme Court in *Minnesota Mining Co. v. National Co.:*[23]

> Where questions arise which affect titles to land it is of great importance to the public that when they are once decided they should no longer be considered open. Such decisions become rules of property, and many titles may be injuriously affected by their change. Legislatures may alter or change their laws, without injury, as they affect the future only; but where courts vacillate and overrule their own decisions on the construction of states affecting the title to real property, their decisions are retrospective and may affect titles purchased on the faith of their stability. Doubtful questions on subjects of this nature, when once decided, should be considered no longer doubtful or subject to change.[24]

*Nevada v. United States*[25] is a roughly similar case to the one at bar. In *Nevada,* the Court found that *res judicata* applied, thereby preventing the United States from re-litigating issues resolved in a court approved settlement agreement involving rights to water from the Truckee River. In *Nevada,* the original settlement judgment was entered in 1944, and 29 years later the government instituted another challenge seeking additional water rights to the Truckee River for the benefit of the Pyramid Lake Indian Reservation. The Court found that all water rights from the Truckee River had been previously and conclusively decided. The Court noted that the "policies advanced by the doctrine of *res judicata* perhaps are at their zenith in cases concerning real property, land and water . . . ."[26]

## C. Legal standard applicable to *res judicata* or claim preclusion.

This Court is presented with the issue of the preclusive effect of the *Nebo Oil* case on the current litigation. The classic formulation of the claim preclusion doctrine was set forth in *Cromwell v. County of Sac:*[27]

> [T]he judgment, if rendered upon the merits, constitutes an absolute bar to a subsequent action. It is a finality as to the claim or demand in controversy, concluding parties and those in privity with them, not only as to every matter which was offered and received to sustain or defeat the claim or demand, but as to any other admissible matter which might have been offered for that purpose.

■ The Cromwell test has been little altered. The Fifth Circuit has applied a four-part test for determining when a claim will be barred as a result of a judgment in a prior action: (i) there must be a final judgment on the merits; (ii) the prior action must have involved the same parties

---

dicata Developments," 20 BLR 75, 77 (Summer 2000).

**23.** 3 Wall. 332, 70 U.S. 332, 334, 18 L.Ed. 42 (1865).

**24.** *Id., (quoted* in *Nevada v. United States,* 463 U.S. 110, 129, n. 10, 103 S.Ct. 2906, 2918, n. 10 (1983)).

**25.** 463 U.S. 110, 103 S.Ct. 2906 (1983).

**26.** *Id.,* 463 U.S. at 129, n. 10, 103 S.Ct. at 2918, n. 10.

**27.** 94 U.S. 351, 352, 24 L.Ed. 195 (1876).

or their privies; (iii) the prior action must have involved the same claim; (iv) the judgment in the prior action must have been rendered by a court of competent jurisdiction.[28] This court finds that all four elements are met. Elements (i), (ii) and (iv) are not major points of contention in this litigation, although privity is briefly addressed in Part – D below. Element (iv) is where the greatest dispute lies and is addressed in Part – E below.

### D. Plaintiff's share privity with Nebo Oil Co. for purposes of *res judicata.*

Privity, as one of the necessary elements for application of *res judicata*, is a rather amorphous, factual determination. Often it is utilized in a conclusory fashion—privity "is not a requirement we can satisfy through inquiry; rather the existence of 'privity' is the inquiry satisfied."[29] It has also been described rather cryptically as a "close enough relationship."[30] A relevant cite is found in *Latham v. Wells Fargo Bank, N.A.:*[31]

'[P]arties' for the purposes of res judicata does not mean formal, paper parties only, but also includes 'parties in interest, that is, those persons *whose interests are properly placed before the court* by someone with standing to represent them are bound by matters determined in the proceeding.' ... A non-party is in privity with a party for res judicata purposes ... if he has succeeded to the party's interest in property....[32]

The concept of privity is not disputed or really addressed by the United States. The government admits that plaintiffs in this case are ancestors in title to Nebo Oil's mineral rights. Therefore, for purposes of *res judicata*, this Court finds that plaintiff's "succeeded" to Nebo Oil Co.'s "interest in the property" and that there is privity between plaintiffs and Nebo Oil Co.

### E. Scope of the claim preclusion doctrine—application to this case.

The most contentious aspect of this *res judicata* inquiry is determining the scope of the claim preclusion doctrine. In this case, that determination is whether the claim to the 180,000 acres is, for purposes of *res judicata*, the same claim which was or could have been asserted in the *Nebo Oil* litigation. The scope of *res judicata* preclusion has been enunciated in a variety of ways, *e.g.*, that it addresses all relevant issues,[33] or all claims that could have been advanced,[34] or as a corollary to the affir-

---

**28.** *See Rivet v. Regions Bank of Louisiana, F.S.B.*, 108 F.3d 576, 586, *cert. granted* 521 U.S. 1152, 118 S.Ct. 31, 138 L.Ed.2d 1060, *reversed* 522 U.S. 470, 118 S.Ct. 921, 139 L.Ed.2d 912, *on remand* 139 F.3d 512 (5th Cir.1998); *Travelers Ins. Co. v. St. Jude Hosp. of Kenner*, 37 F.3d 193, 195 (5th Cir.1994); and *Corporate Health Ins., Inc. v. Texas Dept. of Ins.*, 12 F.Supp.2d 597 (S.D.Tex.1998).

**29.** *Russell v. SunAmerica Sec., Inc.*, 962 F.2d 1169, 1174 (5th Cir.1992).

**30.** *Bruszewski v. United States*, 181 F.2d 419, 423 (3rd Cir.1950).

**31.** 896 F.2d 979 (5th Cir.1990).

**32.** *Id.* at 983.

**33.** *Richards v. Jefferson County, Ala.*, 517 U.S. 793, 798, 116 S.Ct. 1761, 1765, 135 L.Ed.2d 76 (1996) ("[A] prior judgment is generally 'res judicata not only as to all matters litigated and decided by it, but as to all relevant issues which could have been but were not raised and litigated in the suit.'" (*citation omitted*)).

**34.** *Goldberg v. R.J. Longo Constr. Co. Inc.*, 54 F.3d 243, 246 (5th Cir.1995) (Res judicata bars "all claims that were or *could have been* advanced in support of the cause of action on the occasion of its former adjudication ... not merely those that were adjudicated." (*citations omitted*)).

mative pleading rules for compulsory counterclaims and affirmative defenses.[35] The basic idea is that, "Claim preclusion or *res judicata*, bars the litigation of claims that either have been litigated or should have been raised in an earlier suit."[36]

■ It does not matter that the law applicable to Nebo Oil may have changed pursuant to the *Little Lake Misere*[37] opinion. It also does not matter whether the application of claim preclusion to a particular case will result in an unfair or harsh outcome.[38] As a general rule, a change in the statutory or case law will not alter the claim preclusion effect of a prior judgment—"the res judicata consequences of a final, unappealed judgment on the merits [is not] altered by the fact that the judgment may have been wrong or rested on a legal principle subsequently overruled in another case."[39]

In regards to what constitutes a claim, the Fifth Circuit accepts or at least endorses the "Same Transaction Test," found in § 24 of the Restatement (Second) of Judgments, which reads as follows:[40]

> (1) When a valid and final judgment rendered in an action extinguishes the plaintiff's claim pursuant to the rules of merger or bar ... the claim extinguished includes all rights of the plaintiff to remedies against the defendant with respect to all or any part of the transaction, or series of connected transactions, out of which the action arose.
>
> (2) What factual grouping constitutes a 'transaction,' and what groupings constitute a 'series' are to be determined pragmatically, giving weight to such considerations as whether the facts are related in time, space, origin or motivation, whether they form a convenient trial unit, and whether their treatment as a unit conforms to the parties' expectations or business understanding or usage.

The government is not free to select a particular 800 acres, litigate over that, lose, and then re-litigate other parcels of land which are similarly situated. This practice runs afoul of the prudent observation in *United States v. Stauffer Chemical Co.*, that a party may not "litigate twice with the same party an issue arising in both cases from virtually identical facts."[41] At the time *Nebo Oil* was brought (1948), the United States was well aware of the marked shift in federal civil procedure which was ushered in with the Federal Rules of Civil Procedure in 1938. With the elimination of the distinction between law and equity, the advent of notice plead-

---

**35.** *Brown v. Felsen*, 442 U.S. 127, 131, 99 S.Ct. 2205, 2209, 60 L.Ed.2d 767 (1979) ("Res judicata prevents litigation of all grounds for, or defenses to, recovery that were previously available to the parties, regardless of whether they were asserted or determined in the prior proceeding." (*citations omitted*)).

**36.** *In re Southmark Corp.*, 163 F.3d 925, 934 (5th Cir.1999).

**37.** 412 U.S. 580, 93 S.Ct. 2389, 37 L.Ed.2d 187 (1973).

**38.** *In re Teal*, 16 F.3d 619, 622 n. 6 (5th Cir.1994) (conclusion reached by court "com-

ports with the well-known rule that a federal court may not abrogate principles or res judicata out of equitable concerns.... Indeed, it must give res judicata effect to a prior judgment even if it would be voidable on appeal because of legal error" (*citations omitted*)).

**39.** *Federated Dept. Stores, Inc. v. Moitie*, 452 U.S. 394, 398, 101 S.Ct. 2424, 2428, 69 L.Ed.2d 103 (1981) (*citations omitted*).

**40.** *In re Southmark Corp.*, 163 F.3d 925, 934 (5th Cir.1999); *Goldberg v. R.J. Longo Constr. Co.*, 54 F.3d 243, 246 (5th Cir.1995).

**41.** 464 U.S. 165, 172, 104 S.Ct. 575, 579, 78 L.Ed.2d 388 (1984).

ing, liberal joinder and amendment, and broad discovery rights, parties had ample opportunity to present all of their related claims and defenses in the same action.

"The United States concedes that the ownership of the mineral rights underlying the 800 acres involved in *Nebo Oil* was decided and cannot be revisited here." (Def.'s Opp.Mot.Summ.J., pg. 11 [Doc. 133]). This Court also finds that the Fifth Circuit applied Act 315 of 1940 to the mineral reservation and sale of the 24,943.93 acre tract to the United States, of which the 800 acres was a part. Accordingly, those minerals underlying the 24,943.93 acre tract were previously held imprescriptible and *res judicata* clearly applies.

As previously discussed, this Court finds that the five other servitudes and the later mineral reservations burdening the 180,-000 acres are virtually identical to the servitude and reservation at issue in *Nebo Oil.*[42] None of the servitudes had been outstanding for longer than eight (8) years upon the enactment of Act 315 of 1940. Therefore, all of the servitudes were equally situated and susceptible to the application of Act 315. In addition, all of the surface of the disputed acreage was acquired by the United States pursuant to the Weeks Act and none of the language in such deeds or mineral reservations would have warranted a different legal conclusion at the time of *Nebo Oil.* Accordingly, this Court finds that the entire 180,000 acres was similarly situated to the 800 acres at issue in *Nebo Oil.*

■ From an examination of *Nebo Oil,* it is obvious that had the government elected, as plaintiff in *Nebo Oil,* to include all similarly situated acreage in that suit, it

would not have changed the decision of that Court. The government has had a "full and fair opportunity" to litigate the application and constitutionality of Louisiana Act 315 of 1940 to this mineral property. The government should not be allowed to litigate now that which it could have litigated 50 years ago. *Res judicata* now bars the United States from re-litigating these issues.

### CONCLUSION

For the foregoing reasons, this Court finds that Plaintiff's Motion for Summary Judgement [Doc. 85] must be granted. A formal judgment, prepared by plaintiffs and approved as to form by the United States, will be signed upon presentation.

---

42. *See* analysis in Part A–3, *supra,* for the proposition that none of the clauses utilized are so substantially different that they would give rise to some interpretation and applica-

tion inconsistent with the default rules for mineral servitudes or with the servitude at issue in *Nebo Oil.*